Estate of Kent Avery, deceased, Irene D. Avery, Executrix v. Commissioner.
Estate of Avery v. Commissioner
Docket No. 1414-67.
United States Tax Court
T.C. Memo 1969-64; 1969 Tax Ct. Memo LEXIS 232; 28 T.C.M. (CCH) 364; T.C.M. (RIA) 69064; April 3, 1969, Filed William G. F. Botzow, 50 Broadway, New York, N. Y., for the petitioner. John K. Antholis and Marvin A. Fein, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in the income tax of petitioner for the period January 1, 1962 through September 5, 1962 in the amount of $6,333.73. The principal issue is whether advances made by petitioner's decedent to a wholly owned corporation were business bad debts deductible in the taxable period ending September 5, 1962. Another issue litigated by the parties is whether the gross income of petitioner's decedent should include amounts received during the period January 1, 1962 through September 5, 1962 as "advances against commissions" rather than the amount reflected on the books of his employer as "commissions earned. *233 " Findings of Fact Some of the facts are stipulated and are incorporated herein by reference. Petitioner is the Estate of Kent Avery, Irene D. Avery, Executrix. The legal residence of the executrix at the time of the filing of the petition herein was New York, New York. Kent Avery ("Avery") was born on October 10, 1907, and died on September 5, 1962. His income for the period January 1, 1962 through September 5, 1962 was reported on the cash basis. At the time of his death Avery was the president and sole shareholder of Kent Avery & Co., Inc., a New York corporation formed by him in 1958. Prior to that time he had held responsible positions with various corporations in the textile industry, dating back to at least the year 1940. For sometime prior to 1946 he was employed by J. P. Stevens & Co., a leading manufacturer of textile products. Between 1946 and 1950 Avery was employed as president of Avery Process Corporation, a corporation engaged in developing an economic method of spinning worsted fibers on a modification of cotton and rayon machinery. During these years he was also employed as a salesman by Avery Worsted Co., Inc., a selling corporation for Avery 365 Process *234 Corporation. Both corporations were "owned" by Avery and Walter Bareiss, a friend of Avery's. Bareiss provided the capital for the corporations, but was not active in their management. In the early years of this enterprise Avery and Bareiss were close friends, but, as a result of Avery's feeling that Bareiss "hampered" his operations of the businesses their friendship deteriorated into bitterness and their business relationship terminated. At the end of 1950 Avery Process Corporation and Avery Worsted Co., Inc. were "sold" to Bachmann Uxbridge Worsted Corporation ("Bachmann"). At that time Avery entered into an employment agreement with Bachmann under which he was to act as General Manager of the two acquired corporations at a salary of $25,000 per year, plus certain bonuses. Avery also served as sales manager and stylist of Bachmann's women's wear operations in New York. At the end of 1952 Avery moved to New York to assume full responsibility for Bachmann's Women's Wear Sales Division, at an agreed compensation of $30,000 per year plus bonues. Bachmann's women's wear sales increased greatly under Avery's direction, primarily due to the success of a so-called "poodle cloth" styled *235 by Avery. After working in New York for a while Avery began to have difficulty in working with the Bachmann management. Avery felt that he was not getting full cooperation from company executives. He left this job sometime in 1954 after becoming frustrated& with this situation. It is not clear what Avery did between 1954 and 1957, but in 1957 he became consulting stylist for Forstmann Woolen Co., a division of J. P. Stevens & Co., Inc. Such employment terminated prior to his organization of Kent Avery & Co. in 1958, again because of his difficulty in working with the company's management. Avery had unusual talents as a stylist of fabrics, the term for one who furnishes the creative ideas for fabrics as to such matters as weight, pattern, color and appearance, and he had an excellent reputation as such. Unfortunately, he had very serious personality problems, and his inability to work with persons in superior or equal positions caused him much unhappiness and often led to his change of employment. Although Avery was able to find employment from time to time which permitted him to maintain the standard of living of an affluent individual, the prospects of a satisfactory or enduring *236 employment relationship were poor as a result of his personality. Due to his personal problems and the difficulties he was experiencing in his various jobs and elsewhere Avery began to consult a psychiatrist, Dr. M. Michael Cohen, in 1957. Dr. Cohen saw Avery on a regular basis from 1957 until the time of his suicide on September 5, 1962. Avery was diagnosed as a "manic-depressive," who had paranoid symptoms, feelings of insecurity, suspicion, rebellion against authority and persecution. Dr. Cohen believed that many of the problems Avery experienced when working with superiors could be eliminated if Avery would form his own business. Dr. Cohen recommended this to Avery sometime in 1958. In October, 1958, Avery formed Kent Avery & Co., Inc. (hereinafter sometimes referred to as "the corporation"). One of the purposes in organizing the corporation was to provide Avery with a vehicle to exploit the use of his talents as a stylist and his experience and knowledge of the manufacturing and sale of finished goods for the women's wear industry. Another purpose was simply to provide a source of income to meet the needs of his family. Underlying both these purposes was his desire to avoid *237 some of the problems he encountered when working for others or in relationships with persons of superior or equal status. He had no such problems when working with persons who were his subordinates. The corporation's business was the styling and sale of women's wear piece goods for the coating and suiting trade, sometimes referred to as the "cut-up trade." The corporation purchased woolen yarn and had it woven, dyed, finished and sponged by commission contractors. The corporation also bought some wool and had it spun into yarn by contract spinners. The yarn purchases, which were essential to the operation of the business, were factored by Meinhard & Company, Inc. In addition, the corporation, from the time of its organization until Avery's death, factored its accounts receivable under factoring agreements with the First National Bank of Boston and Crompton-Richmond Co., Inc. At the time of the organization of the corporation 1,000 shares of capital stock were issued to Avery for $50,000 in cash and property. These 1,000 shares constituted all of the issued and outstanding stock of the corporation from the date of its incorporation to the date of Avery's death. 366 Avery *238 also paid into the corporation an additional amount of $50,000 which was evidenced by a six percent demand promissory note dated January 1, 1959, bearing the name of Kent Avery & Co., Inc. as promisor and payable to Kent Avery. Thus, between October 7, 1958 and December 31, 1958, Avery paid $100,000 into the corporation, which amount was reflected on its books as follows: Capital Stock
$10,000
Paid-in Surplus
40,000
Note Payable - Kent Avery
50,000
Part of these funds came from the sale of Avery's cooperative apartment for $60,000. In addition to the $50,000 note to Avery dated January 1, 1959, the corporation issued him a further $50,000 six percent demand note dated September 30, 1960 upon the receipt of $50,000 in cash from him at that time. The funds thus advanced to the corporation were obtained by Avery through a loan to him in a like amount that was made by the Chemical Bank New York Trust Company ("Chemical Bank"). Avery's note dated January 1, 1959 was subrogated to all debts of the corporation by an instrument dated April 8, 1959. From the date of the organization of the corporation until Avery's death, no part of the principal on this note was ever *239 repaid, nor did the corporation ever make provision for the repayment of this note. The corporation made payments to Avery designated on its books as "interest" on the dates and in the amounts indicated as follows in respect of the January 1, 1959 and September 30, 1960 notes: Date 1959
Amount
June 29
$1,500.00
Dec. 30
1,500.00
1959 Total
$3,000.00
Date 1960
June 30
1,500.00
Oct. 17
500.00
Nov. 25
750.00
Dec. 23
1,000.00
1960 Total
$3,750.00
Date 1961
Jan. 26
500.00
Feb. 24
500.00
Mar. 27
500.00
Apr. 26
500.00
May 31
500.00
June 30
500.00
July 28
500.00
Aug. 31
500.00
Sept. 27
500.00
Oct. 30
500.00
Nov. 13
500.00
Dec. 21
500.00
1961 Total
$6,000.00
Date 1962
Jan. 26
500.00
Feb. 27
500.00
Mar. 28
500.00
Apr. 30
500.00
May 31
500.00
June 29
500.00
July 31
500.00
Aug. 31
500.00
1962 Total
$4,000.00
Avery served as president and manager of the corporation until his death. He was the dominant figure in its affairs, and as the corporation's sole stylist, his efforts were indispensable to the corporation. His compensation from the corporation for the years 1959 through 1961, including interest received on *240 the above-mentioned notes, was as follows: Year
Salary
Commission
Interest
Total
1959
$ 8,500
$ 8,520.34
$3,000
$20,020.34
1960
4,800
15,397.84
3,000
23,197.84
1961
12,562
11,181.69
6,000
29,743.69
The corporation also obtained bank loans from the Chemical Bank, upon notes as follows: Date of
Date
Amount
Amount Paid
Date
Cancelled
Note
Payable
Paid
11/30/59
1/15/60
$50,000.00
* $50,000.00
1/18/60
1/18/60
1/ 8/60
1/15/60
20,000.00
* 20,000.00
1/18/60
1/18/60
1/15/60
1/29/60
70,000.00
* 70,000.00
1/29/60
1/29/60
1/29/60
2/29/60
70,000.00
** 70,000.00
2/29/60
2/29/60
2/29/60
demand
50,000.00
*** 25,000.00
6/30/60
5,000.00
7/29/60
10,000.00
8/31/60
10,000.00
9/30/60 367 All of the foregoing notes were guaranteed by Avery. On March 29, 1961, the corporation borrowed $50,000 from the Chemical Bank giving a promissory note in that amount, which note was guaranteed by Avery. This loan was renewed on *241 October 16, 1961 and October 31, 1961 and was still outstanding as of September 5, 1962. The renewal note dated October 31, 1961 was guaranteed by Samuel Scoville Paschal, who secured his guarantee with marketable securities having a value in excess of $50,000. The corporation was short of working capital throughout the period Avery was associated with it and its business was unprofitable from the very beginning. Its net operating losses for the years ending September 30, 1959, 1960, 1961 and 1962 were $39,891, $62,760, $19,905, and $119,128 respectively. In the early summer of 1962 Meinhard & Co., Inc. ("Meinhard"), the factor which financed Avery's yarn purchases, declined to extend credit for further purchases. Due to the corporation's lack of sufficient funds and the necessity of yarns for the conduct of its business, its operations were sharply curtailed. Wool purchases ceased completely and yarn purchases declined drastically, as did the commission spinning, twisting, yarn dying, weaving, mending, finishing, and sponging. On August 8, 1962, the corporation was served a summons and complaint in an action by Meinhard seeking judgment for money owed to Meinhard. The corporation *242 defaulted in answering the complaint on August 29, 1962 and Meinhard proceeded to enter judgment, which it did September 6, 1962. On September 5, 1962 Avery committed suicide. Though his suicide was not connected with the financial plight of the corporation it could not function without him. A meeting of creditors of the corporation was held on September 7, 1962. The purpose of the meeting was to "freeze" the corporation's conduct of business so that the creditors could assure themselves that any monies received by the corporation in the future would be equitably distributed to them. An audit of the corporate books as of August 31, 1962 was ordered and all checks were ordered to be countersigned by the accountants making the audit. Thereafter, the corporation reduced its staff substantially, with only a minimum number retained to maintain the shell of a going business. Meanwhile, the corporation's inventory was being liquidated as favorably as possible. Its tentative balance sheet (including accountants' notes) for the period ending August 31, 1962 was as follows: ASSETS
CURRENT ASSETS
Cash in Bank and On Hand
$ 465.42
Merchandise Inventory
135,316.47
TOTAL CURRENT ASSETS
$135,781.89
FIXED ASSETS
Cost
Accumulated
Furniture, Fixtures and
$10,227.25
$3,105.65
$ 7,121.60
Equipment
Leasehold Improvements
3,304.68
1,970.67
1,334.01
TOTALS
$13,531.93
$5,076.32
$ 8,455.61
8,455.61
OTHER ASSETS
Advances to Officer
$ 3,472.76
Prepaid Insurance
1,084.53
Sundry Receivable
5.08
Organization Expense
77.45
TOTAL OTHER ASSETS
4,639.82
TOTAL ASSETS
$148,877.32
*243 ASSETS
CURRENT ASSETS
Cash in Bank and On Hand
Merchandise Inventory
TOTAL CURRENT ASSETS
FIXED ASSETS
Depreciation
and
Amortization
Net
Furniture, Fixtures and
Equipment
Leasehold Improvements
TOTALS
OTHER ASSETS
Advances to Officer
Prepaid Insurance
Sundry Receivable
Organization Expense
TOTAL OTHER ASSETS
TOTAL ASSETS 368 LIABILITIES, CAPITAL STOCK AND DEFICIT
CURRENT LIABILITIES
Accounts Payable
$122,211.17
Due to Factor
* 46,064.64
Note Payable - Bank
** 50,000.00
Notes Payable - Officer-Subordinated
*** 100,000.00
to all Indebtedness
Accrued Expenses and Sundry Payables:
Withheld Payroll Taxes
$1,055.23
Legal and Audit Fees
7,408.00
Due to Customers
892.23
New York City Gross Receipts Tax
2,000.00
Payroll Taxes
421.21
Commissions
346.63
Sundry
95.98
12,219.28
TOTAL CURRENT LIABILITIES
$330,495.09
CAPITAL STOCK AND DEFICIT
Capital Stock - Par Value $10.00 Per
Share
Authorized 2,000 shares
Issued and Outstanding 1,000 share
10,000.00
Paid in Surplus
40,000,00
Defit
(231,617.77)
(181,617.77)
TOTAL LIABILITIES, CAPITAL STOCK AND
$148,877.32
DEFICIT
*244 On October 1, 1962 the *245 board of directors authorized an assignment for the benefit of creditors. The loans outstanding to the Chemical Bank as of September 5, 1962, the date of the decedent's death, were as follows: (a) $50,000.00 due from Kent Avery personally by his promissory note to Chemical Bank dated September 30, 1960 which amount he in turn advanced to the corporation as evidenced by its promissory note dated September 30, 1960. (b) $50,000.00 due from the corporation as evidenced by the promissory note dated October 31, 1961 which note was guaranteed by Kent Avery and Samuel Scoville Paschal. As collateral for these two notes a life insurance policy on the life of Avery having face value of $100,000 was assigned to the Chemical Bank and Samuel Scoville Paschal was named beneficiary of another life insurance policy on the life of Avery having a face value of $50,000. Sometime subsequent to Avery's death, the proceeds of these policies were applied towards the payment and cancellation of the above loans and interest thereon outstanding to Chemical Bank. The balance of the proceeds, $49,992.45, was paid over to the corporation on October 22, 1962. The corporation made no payment on the promissory *246 note to Avery dated January 1, 1959. The net result of the foregoing transaction was that the loans to the Chemical Bank were completely paid and the promissory note given by the corporation to Avery dated September 30, 1960 was paid to the extent of $49,208.79. Accordingly, the aggregate balance due on these two notes as of October 22, 1962 was in the amount of $50,791.21, and the corporation had a deficit of $53,375.74 in excess of its capital stock and paid in surplus, as appears from the tentative Balance Sheet of the corporation as of October 26, 1962, prepared by the accountants selected by the corporation's creditors. Under date of November 20, 1962, the corporation's two largest creditors submitted to the general unsecured creditors of the corporation an offer of Westwood Textile Mfg., Inc. to purchase their claims 369 at 40 percent thereof, such offer having been made by Westwood Textile Mfg., Inc. under date of November 19, 1962 to George J. Hult, Secretary to the Creditors' Committee of Kent Avery & Company, Inc. and having been accepted by him. On December 10, 1962, petitioner sold to Westwood Textile Mfg., Inc., all of Avery's stock in the corporation for $2,500, *247 and released Westwood Textile Mfg., Inc. and the corporation of any and all claims and debts. The above sale and release by petitioner was in connection with a transaction whereby Westwood Textile Mfg., Inc. bought the claims of substantially all the general unsecured creditors of the corporation at an amount equivalent to 40 percent of their claims. The business of the corporation as it existed during Avery's lifetime ceased to exist at his death; the business conducted under the control of the new owner of the stock is substantially different and it is now profitable. In determining the deficiency herein the Commissioner disallowed the $50,000 deduction claimed on petitioner's return as a business bad debt in respect of the January 1, 1959 note; instead he ruled that the advances reflected in that note constituted contributions to capital and that "[since] the shares of capital stock of Kent Avery & Company, Inc. become worthless within the taxable year and are capital assets a capital loss deduction is allowable * * *." Alternatively, he ruled that there was a nonbusiness bad debt loss, the deductibility of which is limited to $1,000 pursuant to sections 166 and 1211, I.R.C. *248 1954. From January 2, 1962 through August 24, 1962 Avery received as "advances against commissions" eleven payments from the corporation totalling $14,500, of which $500 was returned by Avery to the corporation on August 21, 1962, the same day that he received it, leaving net "advances" in the aggregate amount of $14,000 in that year. The books of account of the corporation reflect that Avery had earned commissions on sales as of August 31, 1962 in the aggregate amount of $12,102.50. At no time during the period commencing January 1, 1962 and ending September 5, 1962, nor at any time thereafter has the difference between the $14,000 described as advances and the alleged commissions earned of $12,102.50, i.e., $1,897.50, been returned by Avery or his estate to the corporation. The return for the taxable period did not report any portion of these advances or commissions as income, but it reported $14,500 as a "return of capital." The Commissioner determined that $14,500 was includable in gross income in respect of this amount, but now concedes that only $14,000 should be thus included; petitioner, on the other hand, concedes that $12,102.50 was includable in gross income, and contests *249 the Commissioner's present position only to the extent of $1,897.50. Opinion RAUM, Judge: The Government opposes petitioner's claimed right to a $50,000 business bad debt deduction in respect of the January 1, 1959 note on three separate grounds: (a) that the note represents a $50,000 capital contribution and not a debt at all; (b) that even if it was a debt, it did not become worthless until after September 5, 1962; and (c) that in any event it was not a "business" debt and the loss may be treated only as a "nonbusiness" bad debt. We hold that petitioner is entitled to prevail on all three grounds. (a) A determination of whether an advance made by a shareholder to his wholly owned corporation creates a true debtorcreditor relationship depends upon the particular facts involved. John Kelley Co. v. Commissioner, 326 U.S. 521; Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6), certiorari denied 352 U.S. 1031; Leach Corporation, 30 T.C. 563. And the burden of proof as to whether the note represents a true indebtedness is upon the taxpayer. John Kelley Co., supra;, Crown Iron Works v. Commissioner, 245 F. 2d 357 *250 (C.A. 8); Arlington Park Jockey Club v. Sauber, 262 F. 2d 902, 905 (C.A. 7). Petitioner attempts to establish the existence of a true debtor-creditor relationship by showing that all the formal characteristics of a debt were present here. The advance was evidenced by a note signed by the "debtor" and regular interest payments were made in accordance with the terms of the instrument. The meticulous arrangement of the form of the transaction, however, is not controlling in determining the true nature of the advance, Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2), cert. denied, 359 U.S. 1002, though it is entitled to some weight. Charles E. Curry, 43 T.C. 667. 370 The critical question here is whether there was a bona fide intention to effect repayment, and the existence of a realistic prospect of repayment at the time of the purported loan is strong evidence of such intention. Cf. Santa Anita Consolidated, Inc., 50 T.C. 536, 552; American Processing E Sales Co. v. United States 371 F. 2d 842 (Ct. Cls.). We think that there was such realistic prospect of repayment here. At the time the corporation *251 was organized Avery had a great deal of experience in the textile trade and he was well regarded in the field. His outstanding success in expanding the sales of Bachmann as well as his continued activity in the textile trade suggested similar success in this venture. In addition, it does not appear that Avery anticipated any great difficulty in obtaining financing for his purchases of necessary materials. The expectation of repayment was entirely reasonable, and this $50,000 does not appear to be a capital investment that was intended to ride with the ups and downs of the venture. See Wilfred J. Funk 35 T.C. 42, 50. Moreover, it is clear that this is not a case of "thin capitalization." Cf. Ambassador Apartments, Inc., 50 T.C. 236; Isidor Dobkin, 15 T.C. 31, aff'd per curiam 192 F. 2d 392 (C.A.2). The ratio of Avery's investment ($50,000) in the corporation's stock to his purported loan ($50,000) was only 1 to 1. The unavoidable absence of testimony by Avery has made our inquiry into his relationship with the corporation more difficult than usual and thus our conclusion is not altogether free from doubt. Nonetheless, we think that *252 the prospects of repayment at the time of Avery's advance were sufficiently reasonable to justify a conclusion that a true creditor-debtor relationship was intended and that the treatment of the loan thereafter was consistent with that relationship. We so find. (b) Nor do we agree with the Commissioner's argument that the debt did not become worthless until after the taxable period ended September 5, 1962. It may be noted preliminarily that in determining the deficiency the Commissioner treated this item as having become "worthless during the taxable year." Whether the burden therefore shifted to him in this connection is a matter that we need not decide because it is clear to us on this record that the debt did in fact become worthless no later than Avery's death. His skills were indispensable if the corporation were ever to repay the loan. At the moment of his death the corporation's prospects were dismal and it was in a hopeless financial condition. The creditors' claims were thereafter bought up at 40 cents on the dollar in November 1962 by Westwood Textile Mfg., Inc. and it also purchased the Avery stock for $2,500 in December 1962, but only upon obtaining a release of all claims *253 against the corporation (including presumably the claim based on the $50,000 note in question). This circumstance hardly establishes that the note had any value on September 5, 1962, and indeed suggests the contrary. We think that any realistic appraisal of the situation as of the moment of Avery's death must result in the conclusion that the debt became worthless as of the end of the tax period, and we so find. (c) We also reject the Commissioner's final alternative position to the effect that the note represented a "nonbusiness" bad debt. Petitioner's business was primarily that of a stylist, and was based upon his unusual talents in this field. The corporation was organized to exploit those talents. Where a stockholder-employee's loan to his corporation is made for the purpose of protecting his job, it has been recognized that the loan may be proximately related to his trade or business (as an officer or employee) and therefore may qualify as a "business" loan. Cf. Trent v. Commissioner, 291 F. 2d 669 (C.A. 2), reversing 34 T.C. 910; Weddle v. Commissioner, 325 F. 2d 849, 851 (C.A. 2), affirming 39 T.C. 493, 496; Kelly v. Patterson, 331 F. 2d 753, 756 *254 (C.A. 5); I. Hal Millsap, Jr., 46 T.C. 751, 758, affirmed 387 F. 2d 420 (C.A. 8); Samuel R. Milbank, 51 T.C. 805, -. Here, as petitioner points out, the $50,000 advance was not made merely to protect an existing job, but was made in order to create the very job that Avery sought for himself. His personality difficulties in working under others or with others of equal status were amply described by his psychiatrist at the hearing and were summarized in our findings. His trade or business was that of a stylist and the corporation was organized to enable him to carry on that trade or business. We think that this loan was primarily related to his 371 trade or business as a stylist and only secondarily may it be considered a mere investment in the corporation. Realistically, it was a "business" loan, and we so hold. Accordingly, it is unnecessary to consider whether the amounts received by Avery as "advances against commission" are to be treated as income since any deficiency arising from such treatment would be eliminated by the business bad debt deduction here allowed. Decision will be entered for the petitioner. Footnotes
*. Paid by issuance of a new note. ↩
**. Paid by issuance of a new note and the payment of $20,000.00. ↩
***. Payments made in cash as indicated.↩
*. Unresolved customers disputes on factored accounts receivable, for which the company is contingently liable, were approximately $31,000.00 at August 31, 1962. No provision has been made for any losses which may be sustained in the settlement of these disputes. ↩
**. The company is the owner of a term life insurance policy in the amount of $50,000.00 on the life of Mr. Kent Avery. On November 17, 1961, Mr. Samuel Scoville Paschal was designated as the beneficiary of the policy. He had pledged his securities to the Chemical Bank New York Trust Company to secure the bank loan of $50,000.00 to Kent Avery & Company, Inc. The insured died on September 5, 1962. ↩
***. The corporation is the owner of a term life insurance policy in the amount of $100,000.00 on the life of Mr. Kent Avery. This policy has been assigned to the Chemical Bank New York Trust Company as collateral to secure a $50,000 loan granted to Mr. Kent Avery, the proceeds of which he loaned to the company. Mr. Kent Avery also pledged to the bank his stock in Kent Avery & Company, Inc. and the corporations notes payable to him in the amount of $100,000.00 to secure the $50,000.00 loan made to him by the bank.↩