**Donald C. NIBLOCK, Jr., and Marilyn Niblock, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 17624.**

United States Court of Appeals Seventh Circuit.

Oct. 31, 1969.

Stephen A. Seall, John L. Carey, South Bend, Ind., William A. Thorne, Elkhart, Ind., for appellants.

Johnnie M. Walters, Asst. Atty. Gen., Stanley L. Ruby, Attorney, Tax Division, U. S. Department of Justice, Washington, D. C., Lee A. Jackson, Thomas L. Stapleton, Attorneys, Department of Justice, Washington, D. C., for appellee.

Before DUFFY, Senior Circuit Judge, KILEY and FAIRCHILD, Circuit Judges.

DUFFY, Senior Circuit Judge.

This is an appeal from a judgment of the Tax Court which upheld the decision of the Commissioner of Internal Revenue in determining deficiencies in taxpayer's federal income taxes. These deficiencies resulted from a redetermination by the Commissioner that losses sustained by taxpayer in 1963 constituted nonbusiness bad debts and were erroneously carried back against ordinary income for the years 1960 and 1961. Donald C. and Marilyn Niblock, husband and wife, filed joint federal income tax returns for the years in issue.

Donald C. Niblock, Jr. (taxpayer) started his business career as an employee of Niblock Nash Sales, Inc., a

family-owned business which had been started by his father. He resigned his position and sold his stock in the Company when he was unable to agree with his father over business policy.

Taxpayer and one Merlin Alson subsequently formed Niblock Flying Service, Inc. Taxpayer owned 50% of the stock and was a salaried employee. He eventually sold his interest to Alson and purchased a business which he operated under the name of Hart Mobile Homes Corporation. He was both a stockholder and an employee.

In 1960 taxpayer sold his stock in Hart Mobile Homes but entered into a contract with the purchasers whereby he was to serve as president of the corporation for a five-year period.

Taxpayer claims that after eight or nine months, he discovered he could not work for anyone other than himself or in a business in which he had a substantial proprietary interest. Thereafter, he negotiated a termination of his employment agreement with Hart Mobile Homes.

Approximately October 10, 1961, taxpayer and Alson organized Aero-Marine Development Corporation. He and Alson each owned 50% of the stock and each paid $2,500 therefor.

Aero-Marine initially sold low-priced airplanes and later began the manufacture and sale of small fiberglass boats. Taxpayer was an officer and employee of Aero-Marine from the date of incorporation until his resignation on August 26, 1963. During this period he received a salary for the services which he rendered. As salary, taxpayer was paid at the weekly rate of $150 or $7,800 annually.

From October 25, 1961 to December 31, 1961, Aero-Marine sustained operating losses in the amount of $17,439.13. As a result of these losses, Aero-Marine borrowed $60,000 from a bank. Taxpayer and Alson were guarantors on this loan. The loan was to defray operating expenses necessary to remain in business. In August 1963, taxpayer and Alson were guarantors of Aero-Marine's obligations in the respective amounts of $48,000 and $21,000.

Taxpayer turned over to the Company his personal airplane valued at $16,000 for which he took a demand promissory note. The Company sold the plane for $16,408.13 and used all the proceeds therefrom to pay its creditors.

Both taxpayer and Alson had made advances to the corporation. In August 1963, the taxpayer's advances totaled $16,408.13, while advances from Alson totaled $3,215.77. Neither the advances nor the guarantees altered the voting power or proportionate equity interests of taxpayer and Alson.

The operating history of Aero-Marine shows a net operating loss for 1961 in the amount of $17,439.13; in 1962, the taxable income before deducting its net operating loss carry-forward from 1961 was $8,028.97. The net operating loss in 1963 was $71,605.99.

In October 1963, as a result of his guarantee, taxpayer paid the bank $28,000. In all, taxpayer paid a total of $48,000 to discharge corporate obligations which he previously had guaranteed. Taxpayer had received $4,820 in assets from Aero-Marine and therefore deducted $43,720 as an ordinary loss. He also claimed the $16,408.13 advance as a capital loss since it had become worthless in 1963. The Internal Revenue Service granted taxpayer the right to carry back his net operating losses for 1963 and 1964 to his 1960 and 1961 returns.

In his notice of deficiencies dated September 26, 1966, the Commissioner determined that taxpayer's loss in the amount of $43,720 was a capital loss. Accordingly he determined that the tentative carryback adjustments were erroneously allowed thus resulting in the deficiencies determined for the years 1960 and 1961.

In the Tax Court, taxpayer amended his petition to claim the direct advance of $16,408.13 to the corporation as an ordinary loss.

Section 166(a), Internal Revenue Code of 1954, provides that a taxpayer may deduct a bad debt in full in the year that it becomes worthless. This is limited by the language in Section 166(d), Internal Revenue Code of 1954, which indicates that nonbusiness bad debts are to be treated as short term capital losses. Under Section 1.166–5(b) (2), Income Tax Regs., the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears a proximate relationship to the taxpayer's trade or business will it qualify for ordinary deductible business bad debt status under Section 166(a).

The Tax Court held that taxpayer's loss from the "guarantees" resulted in nonbusiness bad debts. The taxpayer contends that they were a consequence of his trade or business of being a corporate employee and were business bad debts. Isadore Jaffe, 26 T.C.M. 1063, 1068 (1967). This difference of opinion must be resolved by determining whether the loan and guarantees were proximately related to a trade or business of the taxpayer. Whipple et ux. v. Commissioner of Internal Revenue, 373 U.S. 193, 201, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), and Section 1.166–5(b) (2), *supra*.

In order for taxpayer to obtain a deduction for a business bad debt, he must prove that his corporate employment furnished the dominant and primary motivation for making the advances and the guarantees. We disagree with the significant motivating factor test that was applied by the majority in Weddle v. Commissioner of Internal Revenue, 325 F.2d 849, 851 (2 Cir., 1963). We believe that the only test that will inject sufficient certainty into the interpretation of Section 166, *supra*, is the dominant and primary motivation test that we have stated. We interpret thus the admonition of the Supreme Court in Whipple v. Commissioner of Internal Revenue, *supra*, 373 U.S., at page 202, 83 S.Ct., at p. 1174: "Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in the conduct of the corporate business."

We think it is clear that the amounts guaranteed by taxpayer for Aero-Marine, and the loan made to that corporation, bear no relationship to his employment or to his salary as an employee which salary was less than half of the amount of taxpayer's former salary received from Hart Mobile Homes. We think the loan and guarantees were made to build up the value of the stock of the corporation.

Taxpayer had established a practice of selling at a profit, stock in corporations in which he was financially interested and employed. In 1961, he sold shares of Hart Mobile Homes for $50,000. About three years earlier, these same shares had cost him $5,000. He had started Aero-Marine with Alson although taxpayer asserted he could not work for anyone other than himself. The total initial investment in Aero-Marine was only $5,000. Taxpayer formed Surf Rider, Inc. after he left Aero-Marine. Subsequently he sold 50% of his Surf Rider stock, thereby relinquishing his opportunity to be in complete control of his own business. The Tax Court may very well have considered this history in evaluating taxpayer's contention that he started and maintained Aero-Marine because he was unable to work for anyone other than himself. Taxpayer's situation is unlike that found in the case of Isadore Jaffe, *supra*. In the case at bar, the Tax Court found there was no extraordinary circumstances indicating that taxpayer's personality would make future employment problematical. There also was no corroborating testimony indicating that taxpayer's personality would preclude him from employment. See also Estate of Avery, 28 T.C.M. 364 (1969). We agree with the Tax Court that the need for financial incentive through equity ownership and

**1188**

not the need for independent employment was the motivating force for taxpayer's actions.

Furthermore, there is nothing in this record that indicates that taxpayer would have been discharged if he had failed to make the loan and guarantees or that such loan and guarantees were made in order for him to obtain additional salary benefits. Trent v. Commissioner of Internal Revenue, 291 F.2d 669 (2 Cir., 1961). On the contrary, it is quite evident that taxpayer's dominant interest was in capital gain income.

Certainly, taxpayer did not prove that his status as an employee was the dominant and primary factor in making the loan and guarantees. There was no proximate relationship between his status as an employee and the loan and guarantees which he made.

We think the Tax Court was correct, and judgment herein is

Affirmed.