WILLIAM G. YOUNG and NANCY YOUNG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Young v. Commissioner
Docket No. 7764-70
United States Tax Court
T.C. Memo 1974-76; 1974 Tax Ct. Memo LEXIS 239; 33 T.C.M. (CCH) 397; T.C.M. (RIA) 74076; March 28, 1974, Filed. *239 The petitioner made payments to two bonding companies and a bank as required by indemnity and guaranty agreements which he signed for two corporations in which he was both an investor and an employee. Held: The debts created by payments required by these agreements were proximately related to the petitioner's trade or business and are, therefore, deductible as business bad debts under the provisions of sec. 166(a). Mark J. Klein, for the petitioners. Larry K. Akins, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined a deficiency of $2,545.52 in the petitioners' federal income tax for the calendar year 1965. One issue having been conceded, [1] *240 there remains for our determination, from the issues arising out of the respondent's notice of deficiency, the question of whether the petitioners are entitled to a business or non-business bad debt deduction under the provisions of section 166[2] for $9,000 paid in 1965 by William G. Young as indemnity to two bonding companies which furnished bid and performance bonds for construction work by two companies in which William G. Young was both an investor and an employee. Additionally, on petition to the Court, the issue is raised by the petitioners as to whether they are entitled to a business or nonbusiness bad debt deduction under the provisions of section 166 for $4,520 paid in 1965 to a bank in satisfaction of a loan to one of the aforementioned construction companies for which William G. Young was the guarantor. [3] *241 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. William G. Young and Nancy Young are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Overland Park, Kansas. They filed their joint federal income tax return for the calendar year 1965 with the district director of internal revenue at Wichita, Kansas. Nancy Young is a party to this action solely by virtue of having filed a joint return and, consequently, William G. Young will hereinafter be referred to as the petitioner. Upon his graduation from high school in 1948 and until 1956 or 1957, petitioner was employed, at different times, by two construction companies while progressing steadily in job responsibility from laborer to carpenter to superintendent. One of these construction companies for which he worked, the J.H. Young Contracting Company, was owned by members of his family. *242 In 1956 or 1957 the petitioner and one of his brothers, who was not in the family company, started a foundation under-pinning business called the Young Contracting Company. In 1958, because of a lack of enough business to keep both brothers busy, the petitioner left this company and went into business, which ended unsuccessfully 6 or 7 months later, selling car wash machines. The stockholders of Y Company agreed that the petitioner would receive a salary of around $1,000 per month or $12,000 per year. If the business were successful after the first year of operations, the petitioner's salary would be increased to around $1,200 per month, or $15,000 per year. At the time of the formation of Y Company, the petitioner believed that he could eventually earn up to $20,000 per year as general manager. The investors in Y Company believed that after 5 to 10 years of operations they would be able to withdraw between $5,000 and $10,000 from the company each year. Had he not formed and managed the company, the petitioner believed that he could have received compensation of around $12,000 per year for similar employment with another construction company; however he did not seek such a job *243 because he wished to be in business for himself. Because of the nature of Y Company's construction business, bid and performance bonds were required for work to be performed. Bonding for Y Company was furnished by Central Surety and Insurance Corporation (hereinafter Central Surety). When Y Company first started operations, Graham, Sell and the petitioner were all required by Central Surety to sign an indemnity agreement in order to obtain the bonds. Eventually, Central Surety began to accept bonds on Y Company for which only the petitioner agreed to indemnify the bonding company. The amounts of such bonding for which the petitioner signed indemnity agreements reached several hundred thousand dollars. If such indemnity agreements were not signed, the bonds would not be issued and the company would be unable to continue its business. To obtain additional operating capital Y Company issued 25 shares of its stock to the petitioner on January 1, 1960 for $2,500. On January 1, 1961, the petitioner purchased Sell's 30 shares in Y Company for $3,600. With these purchases, the petitioner owned 72.5 percent of the stock of Y Company and his total investment therein was around $12,100. *244 On May 25, 1960, the petitioner joined with S. Hoit Campbell (hereinafter Campbell) and Robert McCrea Leonard (hereinafter Leonard) to form the Central States Construction Company (hereinafter Central States). Central States issued 50 shares of stock of which the petitioner received 25 for which he paid $5,000. Petitioner was elected president of Central States and he exercised full operational control over that company. Central States had no employees itself and its administrative functions were handled by the Y Company. Central States was formed to take the overload work which Y Company, because of its limited bonding capacity, could not bid. The petitioner believed that the additional volume of business generated by or through Central States would increase Y Company's profits and allow him to receive a higher salary. Central States' sole business was also the construction of commercial and educational buildings. Central States acted as a general contractor and Y Company as a subcontractor. Just as with Y Company, Central States was required to secure bid and performance bonds for its construction work. The Commercial Insurance Company of Newark, New Jersey (hereinafter Commercial *245 Insurance) provided the necessary bonding for Central States. The petitioner, along with Campbell and Leonard, was required by the bonding company to sign an indemnity agreement. The aggregate bonding capacity of Y Company and Central States for which the petitioner was liable as an indemnitor reached into the hundreds of thousands of dollars. On or about August 31, 1961, Central States issued an additional 50 shares of stock. The petitioner received 25 of these shares in return for an additional investment of $5,000 which maintained his 50 percent ownership in Central States. At this point the petitioner's total investment in Central States was $10,000. Starting in late 1959 or early 1960, Y Company began borrowing money from Patrons State Bank (hereinafter Patrons State) for use as additional operating funds, without which Y Company could not have continued its business. The amount borrowed varied from a high of $15,000 to a low of $1,000. The petitioner was required to guarantee this loan from Patrons State. Sometime between May and August 1962 both Y Company and Central States terminated the active conduct of business. Both companies became insolvent during 1962 due to *246 a shortage of work, underbidding of contracts and strikes in the construction business. Because of this insolvency, the bonding companies would not issue any bonds on new construction work and consequently operations ended. Since the termination of operations by Y Company and Central States, the petitioner has been self-employed in the construction business, except for a brief, but unsuccessful, stint in owning and operating a cosmetic franchise. Because of the termination of business by both Y Company and Central States without completion of all work, Central Surety and Commercial Insurance were required to make good on their bonds. During 1965 the petitioner, as the result of his obligation under the indemnity agreements, paid $7,900 to Central Surety and $1,100 to Commercial Insurance. Y Company defaulted on its note to Patrons State and the petitioner, as sole guarantor of the note, paid the bank $4,000 in principal and $520 in interest on the Y Company indebtedness in 1965. Both Y Company and Central States filed timely elections under section 1372 to be treated as small business corporations. Y Company filed returns for 1959, 1960 and 1961 on the calendar year basis. Central *247 States filed a small business corporation return of income for the fiscal year ended August 31, 1961. Neither company filed any returns for later years. These two companies reported gross receipts and losses on their respective returns as follows: Y CompanyCentral States Year
Gross Receipts
Loss
Gross Receipts
Loss
1959
$99,835.90
$ (10,728.24)
$--
$ --
1960
90,828.45
(2,927.89)
--
--
1961
479,135.99
(10,186.82)
104,211.84
(9,863.38)
On his 1959, 1960 and 1961 federal income tax returns, the petitioner reported his share of the losses of Y Company as $4,470.10, $1,513.72 and $5,116.18, respectively, and on his 1961 return he reported his share of the loss of Central States as $4,931.68. For the taxable years 1959, 1960, 1961 and 1962, the petitioner reported the following earnings from employment and self-employment: 1959
1960
1961
1962 Y Company
$8,700.00
$10,506.00
$14,903.18
$6,800.00
Central States
100.00
J. H. Young Construction Co.
900.00
William G. Young, self-employment
1,917.98
12,093.12
Car wash
(602.19)
J.H. Young & Associates
515.00
4,831.79
$10,915.79
$11,021.00
$19,834.97
$18,893.12
The income from self-employment in 1962 was earned, for the most part, after termination of the business of Y Company and Central *248 States. The petitioner's federal income taxes for the taxable years 1959, 1960, 1961 and 1962 amounted to $84.47, $682.78, $560.20 and $2,696.93, respectively. On his 1965 federal income tax return, the petitioner reported, as a deduction against ordinary income, a loss of $9,000 resulting from his payment as "Guarantor on contract performance bond Central States Const. Co." [4] The petitioner also reported therein a capital loss of $4,520 for payment of principal and interest to Patrons State on the Y Company indebtedness which he guaranteed.
In his notice of deficiency, the respondent disallowed the claimed $9,000 ordinary loss and made an adjustment to allow it as a capital loss since it was his determination that such loss represented a nonbusiness bad debt.
OPINION The sole issue presented requires our determination of whether the petitioner is entitled to business or nonbusiness bad debt deductions under the provisions of section 166 for payments made in 1965 under an indemnity agreement with two *249 bonding companies which furnished bid and performance bonds for construction work performed by two corporations in which the petitioner was both an investor and an employee and for payment to a bank in that same year of principal and interest on a loan to one of the aforementioned corporations for which the petitioner acted as guarantor. Section 166(a) provides in part that there shall be allowed as a deduction any debt which becomes wholly worthless within the taxable year. Subsection (d) (1) provides, with respect to worthless nonbusiness debts, that any loss resulting therefrom shall be treated as a loss from a capital asset held for not more than 6 months. If the obligation which becomes worthless is a business debt, then the petitioner may offset the loss against ordinary income. United States v. Generes, 405 U.S. 93, 95-6 (1971). The respondent does not contest the worthlessness of the debts in 1965, rather his contention is simply that the losses constitute nonbusiness debts within the meaning of section 166(d) and thus give rise only to deductions as short-term capital losses. The petitioner, of course, takes the view that the losses are business bad debts with the ensuing *250 tax results under section 166(a). Section 166(d) (2) states that "the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." The issue of whether these indemnity and guaranty payments constitute business or nonbusiness bad debts presents a question of fact. Oddee Smith, 55 T.C. 260, 267 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (C.A. 5, 1972); opinion on remand 60 T.C. 316 (1973); Stuart M. Sales, 37 T.C. 576, 580 (1961), section 1.66-5(b), Income Tax Regs.
Section 1.166-5(b), Income Tax Regs. , provides that for tax purposes the character of a bad debt is determined by the relationship which the debt bears to the taxpayer's trade or business. If the debt bears a proximate relationship to a trade or business of the taxpayer at the time of signing the indemnity and guaranty agreements, it qualifies as a business bad debt. Oddee Smith, supra, at 55 T.C. 260, 267; I. Hal Millsap, Jr., 46 T.C. 751, 754, fn. 3 (1966), affd. 387 F.2d 420 (C.A. 8, 1968); *251 section 1.166-5(b), Income Tax Regs.
Quite patently, in order to determine the degree of the relationship which the debts bear to the petitioner's trade or business, we must first determine the petitioner's trade or business and then whether the debts bear a direct relationship to that trade or business. Hogue v. Commissioner, 459 F.2d 932, 939, fn. 11 (C.A. 10, 1972), affirming a Memorandum Opinion of this Court; Estate of Martha M. Byers, 57 T.C. 568, 577 (1972), affd. per curiam 472 F.2d 590 (C.A. 6, 1973). In the instant case there is no contention that the petitioner is in the business of guaranteeing loans or agreeing to indemnify bonding companies or that the petitioner was in the business of promoting, financing or organizing corporations. The petitioner maintains, and we agree, that he was in the trade or business of being an employee, here the general manager of a construction company, when the indemnity and guaranty agreements were executed. Trent v. Commissioner, 291 F.2d 669, 670-71 (C.A. 2, 1961), reversing 34 T.C. 910 (1960). Cf. David J. Primuth, 54 T.C. 374 (1970). Clearly, the petitioner's acting as indemnitor and guarantor for his corporate employer was related *252 to his trade or business in that if the bonds were not issued or if the additional operating funds were not procured, the corporation would cease to do business and the petitioner would no longer have a job or a salary from that job. The difficulty with the instant case, as with most cases of this nature, is the petitioner's dual status with respect to the corporation. The petitioner here is both an investor and an employee. To be deductible as business bad debts the losses arising from the payments required by the indemnity and guaranty agreements must be proximately related to the petitioner's trade or business of being employed as the general manager of Y Company (which corporation also managed and operated Central States). According to United States v. Generes, supra at 103, the proper measure for determining whether a bad debt has a proximate relationship to the taxpayer's trade or business is that of dominant motivation. See also Niblock v. Commissioner, 417 F.2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court. It must be clear from the record that the primary and dominant reason in agreeing to indemnify the bonding companies and in guaranteeing the loan *253 was business related rather than investment related; an equally balanced relationship between the two interests, much less a mere significant business related motivation, is not enough. Oddee Smith, supra at 60 T.C. 316, 318-19. In resolving the factual question presented, we note the following language in Generes (at 104): C. The dominant-motivation standard has the attribute of workability. It provides a guideline of certainty for the trier of fact. The trier then may compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective. After setting forth the proper test for determining motivation, the Court in Generes went on to decide the case on the evidence in the record. The Court discounted the taxpayer's testimony there as being self-serving and as not bearing the light of analysis of the objective facts there present. However, there is no indication in the Court's opinion that the criteria it applied in reaching a decision for the government were the exclusive factors to be considered in determining the dominant motivation of a shareholder-employee. Rather the decision in Generes was based upon the Court's determination *254 that, viewed in their most favorable light, the facts of the case would not warrant a jury finding in favor of the taxpayer under the dominant motivation test. Resolution of the factual inquiry should include consideration of all the facts and circumstances in each case and the factual inferences to be drawn therefrom. See Hogue v. Commissioner, supra at 938; and Miles Production Company v. Commissioner, 457 F.2d 1150, 1155 (C.A. 5, 1972), affirming a Memorandum Opinion of this Court. Because of the holding in Generes, our inquiry is directed primarily to objective considerations, but we believe that weight must also be given to the taxpayer's testimony which, while admittedly self-serving, we find to be credible. Thus with the foregoing principles in mind, we turn to resolution of the question of dominant motivation in the instant case. In an effort to establish the requisite motive, the petitioner testified that preservation of his job was his primary reason in signing the indemnity and guaranty agreements. We find such testimony convincing and supported by the facts in the instant case. As was done in Generes, we first look at the comparison of the petitioner's salary income *255 and his investment in the two companies. The petitioner's pre-tax salary from Y Company averaged over $12,000 per year during the more than 3 years Y Company was in operation and this salary was increasing each year. The petitioner believed that his annual salary would reach $20,000 if the operations proved successful. In 1961, the year before the demise of the two companies, the petitioner received over $15,000. In the instant case, the petitioner's actual federal income tax payments averaged approximately $1,000 per year and thus the petitioner's after-tax salary averaged approximately $11,000 annually. The petitioner's total investment in both Y Company and Central States amounted to $22,100. [5] *256 In Generes, the $7,000 after-tax salary (although the taxpayer there had a $12,000 pre-tax salary) was less than 1/5 of the $38,900 original investment. In making our comparison of the petitioner's salary income to his investment, we note that, as was not the case in Generes, the petitioner's investment in the two companies was not "taxpaid." In the instant case, because of the subchapter S elections, the petitioner's tax basis in Y Company and Central States was zero [6] *257 and $5,068.32 as of December 31, 1961 and August 31, 1961, respectively, by reason of the losses passed through to the petitioner from the two corporations. After consideration of the above-mentioned factors, we think the comparison of the petitioner's salary to his investment supports his testimony that his dominant motivation in signing the indemnity and guaranty agreements was to protect his job and his salary. There are other factual differences between Generes and the instant case which are of importance. During the years in which the petitioner operated and managed these construction companies, unlike the taxpayer in Generes, the petitioner's principal source of income was provided by his salary from Y Company. In Generes the taxpayer had substantial income (around $28,000) other than from his construction company. There the taxpayer devoted only 6 to 8 hours per week to his construction company business and he worked full time in another job. Such is not the case here. In Generes, the taxpayer only reviewed bids and jobs, made cost estimates, sought and obtained bank financing, and assisted in securing bid and performance bonds while his son-in-law was in charge of the day-to-day construction operations. In the instant case, as general manager, the petitioner *258 was responsible for all the aforementioned duties. In deciding that the petitioner's dominant and primary motive for signing the indemnity and guaranty agreements and thereby incurring the losses in question was the protection and preservation of his employee status as general manager of a construction company with full control over and responsibility for operations, we are impressed by the petitioner's history of self-employment. While we realize that this case does not present the unusual or extraordinary circumstances sometimes found in cases of this nature, we do believe the petitioner's desire to be a supervisor or general manager, as evidenced by his business and self-employment history, is trade or business related rather than investment related. The respondent also contends that the instant case is similar to Niblock v. Commissioner, supra, where the court found (417 F.2d at 1187) that the taxpayer there was motivated by the "need for financial incentive through equity ownership and not the need for independent employment" and that the taxpayer's dominant interest was in capital gain income. There the taxpayer had a history of investing in businesses, which he ran, and then *259 of selling them. Here, the petitioner did invest in several businesses, but we do not think the prospect of capital gain or dividend income was the motivating force. Here, the petitioner got out of three of these businesses because they were losers. As for the Young Contracting Company, which the petitioner formed with his brother, the petitioner got out because there was not enough business for both brothers. Also there is no evidence that the petitioner realized a gain on his exit from the latter business. While realizing and recognizing a gain on any of these businesses certainly was not mandatory to a conclusion that the petitioner was seeking financial incentive through equity ownership, we do not believe such was the petitioner's dominant motivation. Rather we think that his dominant motivation was his employment with those responsibilities and that status which came from being a general manager. After Y Company and Central States failed, the petitioner re-entered the construction business as a self-employed individual, and as far as we can tell, is still maintaining that status. Since we have determined that the petitioner's dominant motivation in signing the two indemnity *260 and one guaranty agreements was to protect his trade or business, we conclude that the petitioner is entitled to business bad debt deductions for his payments required by those agreements, as the debts created thereby were proximately related to his trade or business. Decision will be entered under Rule 155. Footnotes
1. The petitioners have conceded that they received $61.65 more income from a partnership than reported on their 1965 return. 2. All Code references are to the Internal Revenue Code of 1954 as amended unless otherwise indicated. ↩
3. We note with respect to both the indemnity and guaranty payments that in their petition to the Court the petitioners alternatively claimed that such payments were ordinary and necessary business expenses, presumably under sec. 162. No further mention of this argument was made either at the hearing or on brief. Consequently, we consider it abandoned and will not reach that contention, except to note that where, as we believe is the case here with both the indemnity and guaranty payments, there is a debtor-creditor relationship, sec. 162 is inapplicable. M. Seth Horne, 59 T.C. 319, 333-336 (1972), on appeal (C.A. 9, May 11, 1973). We note also that in United States v. Generes, 405 U.S. 93↩ (1971), the court there held that an indemnity payment was deductible as a nonbusiness bad debt. 4. We note, as the petitioner explained in his opening statement, that this claimed $9,000 loss actually represents $7,900 paid to Central Surety and $1,100 paid to Commercial Insurance. ↩
5. As was done in Generes, we have used the cost of the petitioner's investment in the two companies because we do not know the actual fair market value of the petitioner's interests. However, assuming that the petitioner's purchase of Sell's 30 shares of stock in Y Company on January 1, 1961 for $3,600 was indicative of fair market value, Y Company's value was approximately $17,400, of which the petitioner at that point had a 72.5 percent, or approximately $12,615, interest. This closely approximates the petitioner's investment of $12,000 in Y Company. 6. The petitioner claimed a total of $11,100 as his share of the losses of Y Company on his individual federal income tax returns while we determined that his total investment had a fair market value, at the time when contributed of approximately $12,100. The zero tax basis reported in the small business corporation return of income resulted from the fact that the petitioner apparently claimed only $5,000 as his tax basis for property contributed (and hence for his stock's tax basis) on formation of Y Company rather than its $6,000 fair market value.