**Ross D. HOGUE and Mildred M. Hogue, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 71–1569.**

United States Court of Appeals, Tenth Circuit.

May 4, 1972.

George Voss, Dodge City, Kan., for appellants.

Leonard J. Henzke, Jr., Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., and Meyer Rothwacks, Thomas L. Stapleton and Gary R. Allen, Attys., Tax Div., Dept. of Justice, Washington, D. C., with him on the brief), for appellee.

Before SETH and McWILLIAMS, Circuit Judges, and CHRISTENSEN, Senior District Judge.[*]

CHRISTENSEN, Senior District Judge.

Appellants [1] brought this action in the United States Tax Court for a redetermination of a 1964 income tax deficiency determined by the Commissioner of Internal Revenue. The item in dispute was the tax assessed on $19,345.83 claimed in the return to be deductible as a business bad debt arising from appellant's guaranty of certain obligations of a furniture business in alleged advancement of his accounting practice. Consistently with the ruling of the Commissioner, the Tax Court concluded that payments by appellant of the guaranteed loans did not create business debts within the contemplation of the Internal Revenue Code of 1954 as amended, 26 U.S.C. § 166(a) (1) (1970),[2] and the implementing Treasury Regulations, 26 C.F.R. § 1.166–5(b)(2) (1971).[3] As the

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(c) (1970).

1. Mrs. Hogue was made a party to the action and joined in the appeal since she, as the wife of the taxpayer, signed the joint return in question here. For convenience, "appellant" will be used hereinafter to designate the taxpayer, Ross D. Hogue, who was the one significantly involved in the developments of the case.

2. "§ 166. Bad debts
"(a) General rule.—
"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
*   *   *   *   *
"(d) Nonbusiness debts.—
"(1) General rule.—In the case of a taxpayer other than a corporation—
"(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and
"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable

year, of a capital asset held for not more than 6 months.
"(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—
"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

basis for appeal to this court, within the jurisdiction conferred by 26 U.S.C. § 7482, appellant contends that the Tax Court's decision is not supported by the record.

There is little dispute in the record as to most of the significant facts. The controversy centers mainly around inferences to be drawn therefrom and an evaluation of appellant's testimony with reference to his motivation in incurring the debts in question. He did not expressly or directly relate these debts to his accounting practice. But he did include them in the broad sweep of his corporate experiences over a long period of time which in general were within the scope of the type of inquiry directed by the Supreme Court in Whipple v. Commission, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 228 (1963),[4] and of a nature comparable to those which led the Tax Court to approve business deductions in Frank A. Garlove, 24 TMC 1049 (1965),[5] upon which appellant strongly relies. Indeed, there is rather convincing evidence that some of appellant's previous corporate activities were carried on primarily to promote his accounting practice. An appraisal of appellant's case in view of these favorable aspects, and an understanding of the Tax Court's conclusion that these aspects nonetheless did not warrant a finding that the particular debts in question were proximately related to appellant's accounting business will be aided by a review of activities leading up to the loans in question.

Mr. Hogue and his wife were residents of Dodge City, Kansas, at the time their joint 1964 income tax return was filed. Appellant became a certified public accountant in 1942 and practiced continually in Dodge City, Kansas, since that time. In 1946 he formed Ross D. Hogue & Company which was the only active CPA firm in the Dodge City area.

On July 29, 1946, appellant, in furtherance of a community project supported by the local Chamber of Commerce, formed Dodge City Industries, Inc., inducing local businessmen to invest $500 in order that the corporation could promote Dodge City for introduction of new industries. Appellant became secretary of the corporation and his accounting firm furnished all of the accounting services and office space. In May of 1950, the purpose of the corporation was changed to promotion solely of the milo and cereal grain industry and, as a result, the company's name was changed to Grain Products, Inc. With $700,000 in contributed capital and over 400 stockholders, the company became one of appellant's largest clients in total accounting fees. Payments made to Hogue, Beebe & Trindle (the succes-

. . ."

4. "The United States does not dispute the fact that . . . petitioner was engaged in a trade or business but argues that the loss from the worthless debt was not proximately related to petitioner's real estate business. While the Tax Court and the Court of Appeals dealt separately with assertions relating to other phases of petitioner's case, we do not find that either court disposed of the possibility that the loan to Mission Orange, a tenant of petitioner, was incurred in petitioner's business of being a landlord." 373 U.S. at 204–205, 83 S.Ct. at 1175.

5. The Tax Court in *Garlove* held that there was a sufficiently direct and proximate relationship between loans made by an attorney to a corporate client to qualify them as business debts created in connection with the attorney's practice of law. The court reasoned: "The petitioner's practice depended importantly upon personal friendships and referrals. Like most lawyers he did not have the advantage of large retainers assuring him of a certain amount of income for any given year. . . . Since Kentucky Loans was one of the petitioner's few regular clients, we think the loans to it were incurred in connection with his business. . . . By helping the company to continue its operations as profitably as possible, the petitioner hoped to get future business." *Cf.* Gustin v. C. I. R., 412 F.2d 803 (6th Cir. 1969).

sor of Ross D. Hogue & Company) for the period of 1952 through 1968 totaled $71,982.71. In addition, appellant received an annual salary as an officer of Grain Products, Inc., and participated in profit sharing and pension plans. Of 400 stockholders, 35 were appellant's clients at the time of Grain Products' formation and 73 additional shareholders became clients after its formation. Appellant organized Grain Products Terminal Elevator, Inc., in 1955 to operate a public grain elevator. He was president and later became secretary-treasurer. His accounting firm performed all of its accounting services for the period 1955 through 1967, receiving approximately $33,413.34 in fees. Appellant had only a small stockholder's interest in Grain Products, Inc., and Grain Elevator. Appellant also helped to incorporate The Journal, Inc., in 1947, which published a weekly farm paper. This corporation after several reorganizations and name changes was finally liquidated in 1959 and reincorporated as High Plains Publishers. During various periods of time appellant had been a stockholder, director, and officer of this journal but from it his accounting firm received in fees only $3,730.84 between 1947 and 1960.

In 1958, appellant conceived and organized Greek Builders, Inc. This corporation had about 60 preferred stockholders owning 2,101 shares of A and B stock of a par value of $100 per share. Of this amount appellant and his wife owned some 160 shares. Appellant also owned 9,440 shares out of a total of 10,-000 shares of the common stock, having a par value of $1.00 per share. The majority of the class B preferred stock was owned by Mullin Furniture (600 out of 881 shares). It also owned more than one-fourth of the class A preferred stock (318 out of 1,220 shares). During all material times appellant was president and treasurer of Greek Builders, his wife was secretary, and his son vice-president. Greek Builders finished the construction of a fraternity house in Lawrence, Kansas, but its chief finan-

cial backer, a Mr. Chalmers, died, and no new construction was thereafter undertaken. Hogue, Beebe & Trindle furnished office facilities and some accounting services for Greek Builders but received only nominal fees consisting mostly of reimbursement of expenses.

A substantial client of appellant's accounting firm was Mullin Furniture, Inc. The operations of the corporation, conducted by brothers J. D. Mullin and M. E. Mullin, consisted of five stores located in different Kansas cities and producing an annual volume of over $1,000,000. During 1946 to 1952 appellant's accounting firm received varying fees from Mullin Furniture, including a $15,000 special fee for revising its accounting system; during 1952 through 1958 over $19,000 in accounting fees was realized. In addition, Hogue, Beebe & Trindle performed services and received fees from related Mullin Furniture interests such as J. D. Mullin, Mullin Investment, and Mullin Furniture Employees Profit Sharing Trust. Appellant's only stock interest in Mullin Furniture was one share of non-voting stock acquired in 1961.

Sometime prior to 1958 J. D. Mullin, who had been in charge of handling the financial affairs of Mullin Furniture, died, leaving the management of the firm to the surviving brother, M. E. Mullin. The latter was unfamiliar with the financial side of the business and experienced difficulties with reference to financing and in his relations with trustees who had succeeded to the interest of his late brother. In 1958, M. E. Mullin began consulting with appellant for the purpose of devising a plan which would allow him to withdraw from the furniture business. None of the various plans initially worked out by appellant proved acceptable.

Finally, in 1961, appellant formulated a plan agreeable to M. E. Mullin, involving the purchase at $100 per share by Greek Builders of the 3,259 shares of voting stock jointly held by M. E. Mullin, the J. D. Mullin Trust, and Mullin Investment, Inc. To finance this transac-

tion Greek Builders agreed to purchase the accounts receivable from Mullin Furniture, Inc., for $334,933, which it paid by $9,033 cash, issuing 918 shares of Greek Builders to Mullin Furniture, and transferring 2,341 shares of Mullin Furniture voting stock (which thereupon became treasury stock) to Mullin Furniture. Greek Builders subsequently sold the receivables to Bankers Investment Company for $375,869.90. Thereafter, Greek Builders had voting control of Mullin Furniture, with the 918 shares it had retained from the original purchase of all voting stock. At this time appellant traded his one share of Mullin Furniture non-voting stock for one share having voting privileges, and contemporaneously assumed the management and presidency of Mullin Furniture.

Following the acquisition of control of Mullin Furniture by Greek Builders the furniture stores operated successfully for a time, after which they began losing money. Appellant then established a line of credit with a bank in an attempt to pay for an oversupply of furniture inventory obtained by an overly enthusiastic new manager. But the financial situation worsened until it became necessary to dispose of all of the stores except the one located in Dodge City. The operations of this last store at length became so unsatisfactory that in 1964 appellant sought additional financial backing from the First National and Fidelity State banks for the purposes of a complete liquidation [6] apprehending that otherwise anxious creditors might complicate the liquidation. It was anticipated by appellant at this time that with such interim financing there would be enough funds to pay creditors and perhaps later to start up at a new location; neither hope was realized.

The banks were willing to extend the liquidation backing to the business only on condition that appellant would guarantee payment of the loans. Accordingly, two loans for $13,000 and $6,000, respectively, were made to Mullin Furniture, Inc., upon the signature of appellant as president of Mullin Furniture, Inc., and his own personal signature as guarantor. Substantially all of the assets of Mullin Furniture, Inc., were disposed of in 1964. On December 30, 1964, appellant issued his personal

6. Appellant testified as he recounted the chronology of developments following the financial problem in connection with the excessive inventory:

"Q. . . . What happened after that? You were down to two stores, is that right?

"A. Well, no, we ultimately got down to one.

"Q. Ultimately got down to one. All right. Then what happened?

"A. We lost the lease of the store. The Mullin people said that we couldn't · have the store anymore which I never expected because it was their store, the building, but it was their own furniture company that was involved.

"Q. Okay. Then what happened to the assets of the corporation?

"A. Well, the managers were leaving, the general manager wanted to quit and leave, so I decided there was nothing to do but have another sale and completely liquidate the whole thing and pay off our bills and still hope after that was over to have enough money to go to another location and start up again.

"Q. All right. Did you proceed to do that?

"A. No, because I didn't have enough money.

"Q. Didn't have enough money to do what?

"A. Settle up everything and have enough money to go back into business again.

"Q. All right. What were the circumstances under which these two notes we have in issue were obtained?

"A. Well, during this liquidation period I felt that it was a serious financial situation because when you start liquidation sometimes it triggers some other problems, so I wanted a little financial backing of the banks so they'd see me through, the contractual matter of this business, so I set up a line of credit for this purpose and it was here that the banks thought on the loans now I should sign, which I did."

While immediately following this testimony appellant stated that at the time he got these particular loans he was not intending to liquidate the last store, his previous testimony was clearly to the contrary; it was for the trial court to resolve such conflicts.

checks of $13,270.83 to the First National Bank and of $6,075 to the Fidelity State Bank in payment of the two loans last mentioned.

In the 1964 joint income tax return, appellant claimed payments on these notes in the total sum of $19,345.83 as business deductions. The Commissioner refused to recognize them as such, determining the payments to be contributions to capital and not loans. However, the Commissioner further ruled that if such sums were in fact loans the debt was not created in connection with petitioner's trade or business and thus would have to be treated as a loss from the sale or exchange of capital assets pursuant to § 166(d) (1) (B).

The Tax Court rejected the first basis of the decision but sustained the deficiency determination on the latter ground, finding that the guaranties in question were not proximately related to taxpayer's trade or business of carrying on an accounting practice.[7]

■■ Findings of fact by the Tax Court will not be disturbed on review if they are supported by substantial evidence and are not clearly erroneous. 26 U.S.C. § 7482(a) (1970); Fed.R.Civ.P. 52(a); Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1959); Commissioner of Internal Revenue v. Scottish American Investment Co., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113 (1944); Riss v. Commissioner of Internal Revenue, 368 F.2d 965 (10th Cir. 1966). Whether a loan or guaranty is proximately related to an independent trade or business is a question of fact turning on the individual circumstances of each particular case. 26 C.F.R. § 1.166–5 (1971), *supra*; O'Neill v. Commissioner of Internal Revenue, 271 F.2d 44 (9th Cir. 1959); Gulledge v. Commissioner of Internal Revenue, 249 F.2d 225 (4th Cir. 1957), cert. denied, 356 U.S. 959, 78 S.Ct. 995, 2 L.Ed.2d 1066

(1958); Pokress v. Commissioner of Internal Revenue, 234 F.2d 146 (5th Cir. 1956). The burden of establishing such a proximate relationship is on the taxpayer. Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); Spillers v. Commissioner of Internal Revenue, 407 F.2d 530 (5th Cir. 1969); Syer v. United States, 380 F.2d 1009 (4th Cir. 1967); United States v. Clark, 358 F.2d 892 (1st Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966).

■ It is argued by appellant that the evidence shows that the guaranties were made for the benefit of appellant's accounting business since the additional line of credit was obtained with the hope of saving a substantial accounting client from total liquidation. A realization of this hope, it is contended, would have generated additional fees to appellant's accounting firm, secured a client with the type of business justifying a punch card machine purchased by appellant's firm, may have led to appellant's obtaining a $25,000 annual salary, his possible participation in another profit sharing plan, and a further enhancement of his reputation in the management service field of accounting.

■ However, as taught by United States v. Generes,[8] the determinative issue is whether the guaranties of the Mullin Furniture obligations proximately related to appellant's accounting practice to the extent of being dominantly motivated by the object to benefit that practice. Whether Greek Builders was theretofore active or inactive or whether appellant organized other companies to further his accounting business is irrelevant except as the answers may explain the reasons why appellant guaranteed the payment of two liquidating loans made by Mullin Furniture after Greek Builders secured control of the furniture company.

---

7. Appellant made no claim that he was in the business of making loans or that of promoting, financing or organizing corporations.

8. 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972).

In *Generes* it was held that for a determination whether a bad debt has a "proximate" relation to the taxpayer's trade or business and thus qualifies as a § 166 business bad debt, the proper standard is that of "dominant" rather than "significant" motivation. Reversing the lower courts which had applied the significant motivation test, the Supreme Court remanded with direction to enter judgment for the United States in the view that there was nothing in the record which would support a jury verdict in the taxpayer's favor had the dominant motivation standard been embodied in the trial court's instructions. The Supreme Court referred to the fact that the position of the taxpayer on motivation depended largely upon his own self-serving testimony and did "not bear the light of analysis". Nor do we think here that appellant's position that his motivation in guaranteeing the loans was entirely in the pattern of previous corporate activities without any investment concern survives close examination.

It is true that there was substantial evidence from which it could have been found that under prior situations the appellant was motivated by the purpose of creating or retaining clients for his public accounting practice or firm, as he contends. But this circumstance cannot be parlayed reasonably into a general extension of this motivation to every succeeding corporate transaction notwithstanding its intrinsic nature. Both of the notes in question were guaranteed at a time when Mullin Furniture Company was being liquidated in the apparent hope of salvaging a portion of Greek Builders' substantial investment therein insofar as might be feasible. Appellant could have had little concern at that time simply in preserving Mullin Furniture as an accounting client. His influence with and substantial interest in Greek Builders had already been established. The liquidation of the furniture company, orderly or not, upon which he had decided would hardly be impressive to new accounting clients but would have vital bearing upon the value of investments in Greek Builders. Beyond liquidation, the evidence leaves as only speculation whether the furniture company would ever resume operations. Appellant's accounting partners had neither joined in the guaranty of the loans nor did they participate in payment; nor did they have any substantial investment interest in Greek Builders.

The Tax Court's judgment as to the credibility of witnesses appearing before it ordinarily will not be disturbed. But here there seems to be not so much an issue of credibility as that of reasonable inferences from established facts. Appellant, consistent with his theory, testified repeatedly concerning his business motivations for other corporate activities.[9] But it is significant that he was neither interrogated by his counsel, nor volunteered any statement, concerning his motivation or reasoning in guaranteeing the loans in question, except to indicate that the loans were necessary to conduct an orderly liquidation of Mullin Furniture and that the banks would not make them unless they were personally guaranteed.

Even though reasonable minds might differ as to the inferences to be drawn from established facts, it was also the province of the court below to determine which of the competing inferences was most reasonable. The fact finder found that "[p]etitioner guaranteed the notes of Mullin Furniture with the hope that he could save his investment in Greek Builders and realize something on it and not for the claimed reason that he guaranteed the notes to preserve an

9. For example: "Q. Now Mr. Hogue, in your testimony concerning the organization of these corporations that you have told the court about this afternoon had investment ever been any primary motive in the organization of these companies? A. I don't feel that it has because that is not the kind of investment I would be investing in. I work in standard stocks and real estate when I am working toward investing."

existing client." There is ample evidence in the record to support this crucial finding.

█ That the Tax Court concluded also that it did not have to reach the question of motivation in view of its finding that no requisite relationship existed between the loans and appellant's accounting business [10] does not negate the effect of its determinative finding on the issue of motivation. Its conclusion that there was no sufficient nexus shown between the loans and appellant's accounting business to render critical further inquiry concerning motivation is not necessarily impeached by the fact that in *Generes* the question of proximate relationship was presented and discussed solely in the context of motivation.[11] There may be instances where loans are so inherently and peculiarly related to the protection of an investment as simply not to qualify for a business deduction as a matter of law, irrespective of the question of subjective motivation. It is unnecessary for us to decide whether this is such a case since the ultimate conclusion of the Tax Court is clearly supported by the evidence and finding to the effect that there was no dominant business, as distinguished from investment, motivation for the guaranties of the loans in question.

Affirmed.

10. "We believe that petitioner has not shown that there was the requisite relationship between the loans and resulting losses and his business of being an accountant. Oddee Smith, supra, [55 T.C. 260 (1970)] necessary for a finding that the loans in question gave rise to a business bad debt deductible under section 166(a). Therefore we need not concern ourselves with the motivation on the notes herein since motivation becomes an issue only after the required proximate relationship is found. Oddee Smith, supra, T.C.Memo at 22."

(Although *Oddee Smith* in result was favorable to appellant's position here, on March 22, 1972, the Fifth Circuit, *per curiam*, vacated the decision of the Tax Court and remanded for reconsideration

in the light of *Generes*. Summary Calendar Order No. 71–1978.)

11. In *Generes* there was no question involved as to whether an essential relationship existed, the only question being whether it constituted a proximate one involving a trade or business concern as distinguished from an investment concern as the dominant motivation. Hence, proximate relationship was presented and discussed there solely in the context of motivation. We do not believe, however, that it was meant to indicate that no direct, as distinguished from remote, relationship, aside from dominant motivation, need exist between a trade or business and a loan to qualify for a § 166(a) (1) deduction.