FRANK A. HIGGINS and JANINE K. HIGGINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Higgins v. Commissioner
Docket No. 8305-74.
United States Tax Court
T.C. Memo 1976-220; 1976 Tax Ct. Memo LEXIS 185; 35 T.C.M. (CCH) 962; T.C.M. (RIA) 760220; July 13, 1976, Filed Robert H. Carpenter, for the petitioners. Thomas L. Kummer, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a $1,514.85 deficiency in petitioners' Federal income tax for 1971. We are called upon to decide whether petitioners' payments on their guaranty of Frank A. Higgins' corporate client's debt constituted a business or nonbusiness bad debt loss. FINDINGS OF FACT The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Fort Wayne, Indiana, at the time of filing their petition herein. Petitioners filed a joint Federal income tax return for the 1971 taxable year. Hereinafter any reference to petitioner *186 shall be to Frank A. Higgins. Petitioner has been a practicing attorney in Fort Wayne for approximately 25 years. Between 1965 and 1971, more than one-half of the income generated by petitioner's practice derived from work in the fields of taxation, estate planning and probate, and corporate law. Prior to becoming an attorney, petitioner had worked for a life underwriter at several insurance companies. He was a chartered life underwriter as well as a lawyer. His law practice encompassed a number of client referrals deriving from his contacts in the insurance industry. In 1964 or 1965, petitioner first began representing one James Hershberger, an insurance agent in Fort Wayne. Hershberger was also known for "wheeling and dealing"; he orchestrated various business transactions, often finding investors with ready capital for those in need of the same. A number of people profited from Hershberger's activities, including petitioner, for whom Hershberger generated a significant amount of legal work. For the years 1966 through 1971, Hershberger generated the following income for petitioner's law practice: Income Generated
Total Income of
Percent of Year
by Hershberger [1]
Law Practice [2]
Total
1966
$ ,375.00
$ 42,091.88
.89%
1967
13,537.00
79,395.71
17.05
1968
12,632.40
79,805.43 [3]
15.83
1969
13,328.50
75,000.00 [4]
17.77
1970
10,248.34
96,472.19
10.62
1971
2,871.00
103,237.87
2.78
*187 In July, 1967, one of petitioner's clients, Walter Nagel, operated two corporations in the business of providing courses in *188 computer programming to students, Electronic Computer Programming Institute of Indianapolis, Inc., and Electronic Computer Programming Institute of Fort Wayne, Inc. (hereinafter the institutes). Nagel was desirous of selling his ownership interest in the institutes. Petitioner brought Nagel and Hershberger together and Hershberger decided to acquire the institutes through a parent holding company. In 1968, petitioner incorporated Midwest Management, Inc. (Midwest) for Hershberger. Midwest acquired the institutes and employed Nagel to operate them as subsidiaries. On May 31, 1968, the Electronic Computer Programming Institute of Fort Wayne, Inc., assigned all of its receivables and contract rights to Midwest. Midwest issued 43 shares of common stock, of which Hershberger held 22 shares and petitioner held 21 shares. [1] Hershberger paid $1,000 into Midwest in consideration for such shares. Petitioner made no investment in Midwest but received his stock from Hershberger as a general token of appreciation.Hershberger was president of Midwest and petitioner was secretary. Petitioner derived no income from his stock, received no compensation for his officership, and was not involved *189 in the day-to-day management of Midwest. On April 27, 1970, Midwest executed a promissory note to the order of the Peoples Trust and Savings Company (hereinafter Peoples Trust or bank) in the amount of $142,000 payable in 182 days with interest at 9 percent. The note was signed by Hershberger and petitioner in their corporate capacities as well as in their individual capacities. Moreover, Hershberger, petitioner, and petitioner's wife signed a guaranty of Midwest's note individually. [2] Payment of the note was secured by certain of the institutes' receivables. Because the bank was familiar with petitioner and was not familiar with either Hershberger or Midwest, petitioner's execution of the guaranty was at the request of the lender-bank. [3]
*190 Subsequent to April 27, 1970, Peoples Trust advanced Midwest additional sums against Midwest's interest in institute receivables. Payment of these additional sums was similarly guaranteed by petitioner individually. On September 2, 1970, Hershberger died and Peoples Trust decided to foreclose against Midwest's assets (the institutes' receivables) without objection from petitioner. After the institutes were liquidated, $164,472.45 remained owing to the bank. This sum included still further advances by Peoples Trust to facilitate the liquidation, which were also guaranteed by petitioner individually. On April 1, 1971, petitioner and his wife executed a promissory note in favor of Peoples Trust in respect of their liability for payment of this sum. Petitioner filed a claim against the estate of James Hershberger, which claim was disallowed on June 10, 1971. [4]
During the 1971 taxable year, petitioner made nine $850 payments on the April 1, 1971 promissory note. Of the *191 $7,650 paid, $3,508.93 was interest and $4,141.07 was principal. Petitioner deducted all of the principal payments, as well as the interest, on his 1971 return. [5] Respondent determined that petitioner was limited to a $1,000 capital loss in respect of the principal payments. ULTIMATE FINDING OF FACT Petitioner's dominant motivation in co-signing and guaranteeing the corporate debt of Midwest Management, Inc., was not proximately related to his trade or business. OPINION The parties agree that petitioners' 1971 payments arising from their liability on Midwest's debt were deductible as a bad debt loss. They cannot agree, however, upon whether the deduction for such bad debt loss was subject to the limitations of section 166(d) [6] for nonbusiness bad debts. Conceding that, at all times material herein, his only trade or business was that of *192 being a lawyer, [7] petitioner maintains that his sole motive in co-signing and guaranteeing [8] Midwest's obligation was to further his law practice by assuring a continuing flow of business from James Hershberger and clients referred by him. Therefore, he maintains that his loss was incurred in connection with his trade or business (see sections 1.166-5(b) and 1.166-8(b), Income Tax Regs.) and the limitations of section 166(d) are inapplicable. Respondent takes the position that petitioner's loss was sufficiently related to his shareholder interest in Midwest so as to preclude the conclusion that petitioner had the requisite motivation under United States v. Generes,405 U.S. 93 (1972). The issue is one of fact, David Shinefeld,65 T.C. 1092 (1976), and the burden of proof is on the petitioners. Oddee Smith,60 T.C. 316, 318 (1973); Rule 142, Tax Court Rules of Practice and Procedure.
*193 Petitioner relies heavily upon his own testimony as to his motivation and upon the fact that his testimony was uncontroverted. But we are dealing here with subjective intent and, under such circumstances, we are not required to accept such testimony as gospel. See Arnold L. Ginsburg,T.C. Memo. 1976-199. Moreover, we note the Supreme Court's admonition in United States v. Generes,supra,405 U.S. at 106, that selfserving statements "standing alone, * * * do not bear the light of analysis." On the other hand, we are not prepared, as respondent would have us do, simply to focus on that portion of petitioner's testimony in which he described the nature of Hershberger's entrepreneurial gifts, seizing upon petitioner's statement that "a lot of people became relatively wealthy" from Hershberger's ventures, and, without further analysis, conclude that petitioner's dominant motive was to join the ranks of those persons so enriched. Nothing in United States v. Generes,supra, requires such a "heads I win, tails you lose" approach to the use of testimony of an interested party. Our task, as we see it, is to evaluate the record *194 as a whole, including the reasonable inferences to be drawn therefrom and taking into account both the positive and negative elements of testimony of petitioner, whom we heard and observed. Cf. David Shinefeld,supra; see Hogue v. Commissioner,459 F. 2d 932, 934, 938 (10th Cir. 1972), affg. T.C. Memo. 1971-75.This we have done, mindful of the Supreme Court's observation that "a cautious and not a freewheeling approach to the business bad debt" is the order of the day. See United States v. Generes,supra,405 U.S. at 103. We conclude that petitioners have failed to carry their burden of proof.
Admittedly a significant portion of petitioner's fees earned during the 1966-1971 period were in some way generated by Hershberger, and we have no doubt that the expectation of continuing referrals from Hershberger contributed to petitioner's decision to co-sign and guarantee Midwest's debt. However, we do not think the numbers establish the dominance of this purpose; petitioner exposed himself to liability in excess of $164,000 while Hershberger generated only some $13,000 in annual legal fees to petitioner. Under *195 such circumstances, and particularly since the record indicates that Hershberger was already sending petitioner as much legal business as he could, we are not convinced petitioner acted predominantly in the hope that Hershberger would send him more business. Moreover, there is no evidence to suggest that Hershberger would have discontinued this practice had petitioner not accommodated Midwest. [9]
Petitioner attempts to prove the dominance of his business motive by showing the absence of competing investment motives. In this context, he emphasizes the following facts about his stock ownership: the stock was acquired by gift and petitioner contributed no capital to Midwest; his stock was merely a minority interest in a closely held corporation; and the value of Midwest stock was nil in view of the corporation's large debt and use of its receivables as security *196 therefor. That petitioner might have acquired stock by gift would not necessarily have dampened any desire he might have had to enhance the value of such stock by permitting the corporation to borrow against his signature. Similarly, we are not impressed by petitioner's assertion that he had a minority interest in Midwest; clearly, a 48.84 percent interest is not de minimis. If Midwest had grown according to Hershberger's expectations (and we believe these were petitioner's expectations as well), petitioner's interest could have been quite substantial. The value of the stock was nil only because the stockholders chose to employ debt financing for their acquisition. Surely this would not have been done absent the expectation that the institutes would be sufficiently successful to satisfy outstanding liabilities and further to make a profit. The long and the short of the matter is that, consistent with Hershberger's penchant for "wheeling and dealing," Midwest was leveraged and petitioner was in the position to gain substantially if the venture had been successful. That his participation in the leveraging process was not designed to protect a previous outlay of funds to pay for *197 his shares is beside the point; it is enough that there was the incentive to protect the potential enhancement of his shareholder interest. We reject petitioner's attempt to fit the instant situation to other cases in which a business bad debt has been allowed. The issue of business versus nonbusiness bad debt must be decided on the record in the particular case. See Oddee Smith,supra.We therefore see no point in engaging in a detailed analysis of the cases upon which petitioners rely. We note in passing, however, that each such case is distinguishable. In Charles R. Iden,T.C. Memo. 1974-81, the attorney-guarantor's only interest in the stock was as security for his guaranty; there could be no incentive on his part to enhance its value. In Morris B. Parker,T.C. Memo. 1974-60, not only was the taxpayer's shareholder status more directly related to his status as an architect and to the potential for enhancement of the business he expected to obtain but his guaranty was made with the hope that he would be able to collect, from the loan which he guaranteed, substantial sums representing earned but unpaid fees. In Frank A. Garlove,T.C. Memo. 1965-201, *198 there was an extensive pattern of loans by the taxpayer-attorney to several of his firm's clients. By way of contrast, the instant situation involves only one of many ventures of a single client. [10]
By way of summary, we are satisfied that Hershberger's referrals had some value to petitioner's legal practice and that they had some bearing on petitioner's decision to accommodate Midwest. But we are convinced that at best petitioner had at least two reasons [11] for this undertaking -- the continuance of these referrals and the lure of a leveraged profit from the interest in Midwest which he had acquired *199 without cost. Petitioners have simply failed to show that the former reason provided the requisite dominant business motive. [12]
*200 Decision will be entered for the respondent.
Footnotes
1. The parties have stipulated that these sums were generated by Hershberger, and, while we find such stipulation controlling, we are constrained to note that a portion of the fees included in this schedule for 1966 and 1967 were derived from Electronic Computer Programming Institute of Fort Wayne, Inc., a corporation with which Hershberger had no relation until 1968. See infra,↩ p. 5. In 1966 and 1967, the company was in the hands of another of petitioner's clients. 2. The record is unclear as to whether these sums were all of the income produced by petitioner or all of the income produced by the law firm of which petitioner was a member. The parties' stipulation suggests the former; petitioner's testimony indicates the latter. ↩
3. Petitioner's records show an income figure for only eight months of 1968. We have estimated annual income by dividing this figure by eight and multiplying the quotient by twelve. ↩
4. Petitioner had no records of income from his law practice in 1969, but we have accepted petitioner's own estimate in this regard.↩
1. The parties stipulated that Midwest had 43 shares issued and outstanding as noted. This stipulation conflicts with petitioner's testimony that the corporation had 44 shares issued and outstanding with Hershberger holding 23 and petitioner holding 21.The difference is immaterial for our purposes herein and, under the circumstances, we find the stipulation controlling.↩
2. Petitioner testified that he also acted as co-maker and guarantor of earlier loans by Peoples Trust to Midwest. From such testimony, we infer that the April 27, 1970 note represented a continuation and extension of such earlier borrowings in the initial amount of $40,000 to $50,000. There is no evidence in the record from which we might determine when petitioner first undertook a guaranty of Midwest's initial debt in relation to his acquisition of the 21 shares of Midwest stock, although it is a reasonable inference that the guaranty and stock acquisition occurred at about the same time. ↩
3. While we can conclude from the record that petitioner's guaranty was made at the request of the bank, there is no evidence in the record that the bank requested or required petitioner to act as co-maker.↩
4. A co-executor of the Hershberger estate, in disallowing the claim, informed petitioner that estate assets were slightly in excess of $26,000, against which claims in excess of $6,800,000 had been filed.↩
5. Petitioner itemized the interest expense deduction as "Business Expense Develop." Although Form 2106 attached to the return shows the principal payments as an employee business expense deductible as an itemized deduction, petitioner actually deducted this amount from gross income to compute adjusted gross income on the return.↩
6. All section references are to the Internal Revenue Code of 1954, as amended. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
7. See Charles R. Iden,T.C. Memo. 1974-81↩. 8. Neither party seeks to draw any distinction based upon petitioner's dual status. See Putnam v. Commissioner,352 U.S. 82↩ (1956).
9. Nor are we convinced that Hershberger's only method of acquiring the institutes was debt financing guaranteed by petitioner and that petitioner was somehow constrained to make such guaranty in return for Hershberger's business. Petitioner testified that Hershberger's expertise was in matching investors with investments.↩
10. Indeed, in light of the apparent availability of extensive financial resources to Hershberger (see n. 9, supra) and the absence of any evidence that Hershberger would have taken his legal business elsewhere (see p. 13, supra↩), it would appear that an alternative guarantor could have been found if petitioner had been willing to give up his stock interest in Midwest. It therefore can be inferred that petitioner was motivated to retain his interest for the potential profit involved and that it was the retention of that interest that compelled his giving of the guaranty.
11. The record as a whole also suggests the possibility that petitioner's undertaking was motivated, in part, by purely personal reasons other than investment.It is entirely possible that, because the bank would not extend money to Midwest on the strength of Hershberger's signature alone, petitioner lent his signature simply as a personal favor. Cf. Harold Karp,T.C. Memo. 1973-184, affd. per curiam 496 F. 2d 1405 (5th Cir. 1974). We note also that petitioner has not pursued the argument made in the opening statement at the trial that the loss should be allowable on the ground that he was compelled to make good on his guaranty in order to protect his business reputation. Aside from the question whether the motive for payment can be separated from the motive for incurring the obligation (see French v. United States,487 F. 2d 1246↩ (1st Cir. 1973)), the record herein does no more than indicate that petitioner was held in "high regard" by a segment of the business community.
12. While a single debt cannot be allocated in part to business and in part to nonbusiness, United States v. Generes,405 U.S. 93 (1972), this Court has noted its willingness to view separately advances made at different times under different circumstances. Oddee Smith,60 T.C. 316, 320↩, n. 2 (1973). While petitioner's ultimate loss herein appears to have been attributable to more than one advance to Midwest, we do not have sufficient evidence upon which to evaluate any portion or portions of such loss separately.