615 F.2d 1253
 80-1 USTC P 9331
 Richard C. HUNSAKER and Virginia A. Hunsaker, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Appellee.
Richard C. HUNSAKER and Virginia A. Hunsaker, Cross-Appellees,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Cross-Appellant.
 Nos. 76-1349, 76-1842.
 United States Court of Appeals,
Ninth Circuit.
 April 1, 1980.
 
 Charles D. Cummings (argued), Los Angeles, Cal., for appellants.
 Francis J. Gould (argued), Dept. of Justice-Washington, D.C., for Commissioner of I.R.S.; Scott B. Crampton, Asst. Atty. Gen., Washington, D.C., on brief.
 Before GOODWIN, WALLACE and FARRIS, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Richard C. and Virginia A.[1] Hunsaker, taxpayers, appeal a Tax Court judgment upholding in substance the Commissioner's claim of deficiencies for 1968, 1969 and 1970. At issue is the correct treatment of deductions for bad debts during the respective years. The Commissioner cross-appeals from the court's separate decision that payments made by Richard as guarantor on performance bonds were deductible from ordinary income. We affirm the judgment on appeal and reverse the judgment on the cross-appeal.
 
 
 2
 Richard Hunsaker and his father, S. V. Hunsaker, Sr., were both engaged in land development, real estate, and other businesses in their own names. Prior to the years in issue, the two had done business together from time to time through joint ventures, partnerships, and corporate entities.
 
 
 3
 In 1965, S. V. Hunsaker, Sr., organized a California corporation, S. V. H. Investments (SVH), for the purpose of developing specific parcels of land in California. During the years 1965 to 1969, Richard loaned substantial sums of money to his father and to the SVH corporation. These loans were evidenced by unsecured promissory notes at eight percent interest. All were used by Richard's father in an effort to keep SVH solvent. Richard never invested as a stockholder in SVH.
 
 
 4
 SVH operated from 1965 through 1970 with a negative cash flow and other financial difficulties. Richard's father personally advanced more than three and a half million dollars to SVH during this time.
 
 
 5
 In 1968, after his father suffered an incapacitating stroke, Richard became a director of SVH, and in 1969, vice president and chief operating officer. He received no salary or fees for the services he provided SVH, nor did he ever become a stockholder of the corporation. Richard's father died in August 1969. His estate, which owned over 80 per cent of SVH, was insolvent. Richard's loans to SVH were uncollectible.
 
 
 6
 The taxpayers treated the losses Richard had sustained as deductions from ordinary income under 26 U.S.C. § 166(a) (Internal Revenue Code of 1954). The Commissioner asserted that the losses were nonbusiness bad debts under § 166(d), deductible only as short term capital losses. The Tax Court upheld the Commissioner's characterization as nonbusiness bad debts.
 
 
 7
 Under § 166(d)(2) of the Internal Revenue Code, a nonbusiness debt is defined as:
 
 
 8
 " * * * a debt other than
 
 
 9
 (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or
 
 
 10
 (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."
 
 
 11
 It follows that a debt (A) created or acquired in connection with the business of the taxpayer, or (B) the loss of which is incurred in the taxpayer's business, is a business debt and, if worthless, is fully deductible under § 166(a).
 
 
 12
 Richard claims § 166(a) deductibility both ways. He asserts that his business when he made the loans to his father was either money lending or real estate development. The Tax Court found that Richard was neither a money lender nor a person engaged in the lending business. Richard was heavily involved in financing arrangements during the years in question, but all of his financing activities except the loans in issue here were integrally related to his real estate and development business. There were no indicia of a genuine money lending business distinct from his real estate development businesses. See United States v. Henderson, 375 F.2d 36, 41 (5th Cir.), cert. denied, 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967). The Tax Court's finding that Richard was not in the business of lending money is supported by the evidence.[2]
 
 
 13
 That finding leaves a somewhat complicated but relatively straightforward question: Were the debts created in connection with, or were the losses incurred in, Richard's real estate and land development businesses?[3] The Tax Court found as a fact that they were not. This finding likewise withstands review under Fed.R.Civ.P. 52(a).[4]
 
 
 14
 Richard and his father were both engaged in similar businesses real estate and land development and on occasion they had engaged together in related business activities. However, there is no evidence, other than Richard's after-the-fact testimony at trial, that they had jointly invested in any sense of the term in the particular development projects undertaken by the father's corporation, SVH. Nor is there any evidence that Richard's own businesses stood to be affected in any way by the success or failure of that corporation.
 
 
 15
 Richard now asserts, however, that his dominant (indeed, "sole") motive[5] in advancing money and credit to his father and SVH was to participate in the land development opportunity the corporation had undertaken at Serene Lakes, California, for his own profit. He supports this assertion by pointing out that the project had the possibility of grossing over six million dollars. But if he hoped to share in the expected profits as a joint venturer, he submitted no proof that he was ever in a joint venture concerning that project with either his father or SVH. The Tax Court found that at most there may have been preliminary oral discussion of a joint venture. That he had entered into unrelated joint ventures with his father in the past does not, without more, prove one in this case. Cf. Hogue v. Commissioner, 459 F.2d 932, 937-38 (10th Cir. 1972).
 
 
 16
 Richard's own real estate businesses at the times the loans were made and the losses were sustained remained unaffected by SVH and its activities. Richard's own projects could not have profited from any gain or income realized by SVH or resulting from the use of Richard's loans that are in issue here. Likewise, his own projects would not have had to share any losses incurred by SVH. In fact, any effects the survival and success of SVH might have had on Richard were all unrelated to his real estate business: the repayment of his loans plus eight percent interest, filial satisfaction from the protection of his father's investment, and the expectation of future benefits either from future business with his father, or from general enhancement of his father's estate.
 
 
 17
 Richard relies in part on a "source of supply" case, Dorminey v. Commissioner, 26 T.C. 940 (1956). In Dorminey, a taxpayer in the wholesale produce business had a market for two carloads of bananas a week but was having trouble obtaining them. Thus, he helped organize, bought stock in, and advanced money to, a corporation the primary purpose of which was to import bananas. The Tax Court found that Dorminey's dominant motive in making the loans which eventually became worthless was to insure a supply of bananas for his produce business. Thus, he was allowed a business bad debt deduction.[6]
 
 
 18
 Source of supply cases do not help the taxpayer here. As demonstrated, Richard's own real estate business activities depended in no way on SVH's survival. Although he claims that he anticipated sharing in future SVH land development profits as a result of a relationship with his father or with SVH, any such profit sharing relationship was yet to be established. Unlike the source of supply cases, the anticipated benefit to Richard's trade or business from the activities of his father and SVH could hardly be called "real and direct" as a matter of law. See Lundgren v. Commissioner, 376 F.2d 623, 629 (9th Cir. 1967). Indeed, even the speculative benefits Richard contemplated would have been personal, not related to his trade or business.
 
 
 19
 Finally, Richard contends that the Tax Court, as a matter of law, must credit his uncontroverted and self-serving trial testimony as establishing that his dominant motivation for the loans was to make a profit in his own land development business. While the Tax Court may have had a duty to consider that testimony, Imbesi v. Commissioner, 361 F.2d 640, 644-45 (3rd Cir. 1966), it is also entitled to consider contemporaneous objective circumstances surrounding the loans. United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972). Those circumstances support the reasonable inference drawn by the Tax Court as to Richard's motivation, an inference inconsistent with Richard's testimony sometime after the tax controversy developed. See Raymond v. United States, 511 F.2d 185, 189-90 (6th Cir. 1975). The Tax Court was not required to believe Richard.
 
 
 20
 The circumstances relied on by the Tax Court can be framed in terms of the "risk v. potential reward" analysis put forth by the Supreme Court in Generes, 405 U.S. at 104, 106, 92 S.Ct. at 833, 834. SVH was seriously undercapitalized and was experiencing cash flow problems when Richard extended large amounts of money and credit to it. The only return promised him was eight percent interest on unsecured notes. His anticipated expectations of sharing in big profits remained mere expectations of generalized future benefits. His father, who had over three and a half million dollars invested in SVH, would no doubt have shown some gratitude if SVH had prospered. On these facts, the inference drawn by the Tax Court that Richard's dominant motive was to aid his father and his father's ailing corporation is not clearly erroneous. The finding is thus binding on this court. Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).
 
 CROSS-APPEAL
 
 21
 Shortly after its formation by Richard's father, SVH began improving undeveloped land at Serene Lakes, California. In connection with this project, Richard's father and one Frank Patty executed, as principals, faithful performance bonds funded by the General Insurance Company of America (the surety) in favor of the County of Placer and Sierra Lakes County Water District. Patty was the record owner of the Serene Lakes real property, having acquired title from SVH as security for loans he had advanced to the corporation. The Tax Court found that Patty signed the bonds only because the county and water district required the titleholder's signature to be on them. We assume that this finding is correct, although the record before us does not cover the point.
 
 
 22
 Richard purchased from a national bank an irrevocable letter of credit which he deposited with the surety as collateral security to protect the surety against loss in connection with the bonds it had executed. Richard also agreed in writing to hold Patty harmless from any liability in connection with the bonds. Patty in turn extended options to SVH and to Richard to repurchase the Serene Lakes property.
 
 
 23
 In 1969 and 1970, Richard was required, under the terms of the collateral agreement, to pay the expenses of completing improvements at Serene Lakes that SVH could not pay. He did not recover any of the funds so expended from either his father or Patty because of the insolvency of his father's estate and his own hold-harmless agreement with Patty.
 
 
 24
 The Tax Court held Richard's payments under the bond to be deductible from ordinary income under 26 U.S.C. § 166(f).[7] This subsection provided a narrow exception to the general rule of § 166(d) that a noncorporate taxpayer must treat a nonbusiness bad debt as a short term capital loss.
 
 
 25
 Under § 166(f)[8] a "business" bad debt deduction could be taken if all of the following requirements were met:
 
 
 26
 (1) The guarantor, endorser or indemnitor making payment (Richard) was not a corporation;
 
 
 27
 (2) The borrower (Patty and Richard's father) was not a corporation;(3) The proceeds of the original obligation were used in the trade or business of the borrower; and
 
 
 28
 (4) The obligation of the borrower to the creditor (county and General Insurance Company) was worthless at the time of payment, without regard to the guaranty.
 
 
 29
 It is not disputed that the first two requirements are met here. However, the Commissioner argues that the Tax Court erred as a matter of law in finding the third and fourth requirements also satisfied. We decline to consider whether the original loan was in fact used in Patty's or the father's trade or business because that question was never raised in the Tax Court.[9]
 
 
 30
 We turn to the Commissioner's contentions regarding the fourth requirement of § 166(f). This provision focuses on the worthlessness of the original obligation rather than the worthlessness of the guarantor's or indemnitor's claim against the principal debtor(s). Andrew v. Commissioner, 54 T.C. 239, 247 (1970). Despite the Commissioner's protests to the contrary, the Tax Court here did so focus. But it did so in an incomplete fashion.
 
 
 31
 The Tax Court found that Richard's father's obligation was worthless because at the time of the payments his estate was insolvent. This was correct. However, there were two principal debtors on the bond, and Richard failed to show that the obligation of Patty, the other debtor, was also worthless to the county or to General Insurance.
 
 
 32
 The Tax Court excused this omission because, in its opinion:
 
 
 33
 " * * * in substance, the only principal was (Richard's) father * * * . Patty was to be held harmless from any liability resulting from the bonds. Patty was a principal in name only, to comply with local law. Consequently, the liability fell upon (Richard) when his father became insolvent * * * ."
 
 
 34
 But Patty's reason for signing the bonds, together with his freedom from ultimate liability (because of Richard's hold-harmless agreement), does not justify ignoring, for purposes of § 166(f), the fact that Patty was legally bound to the county and the water district as a principal on the obligation. The local governments had good reason to require the land titleholder to be on the bonds, if for no other reason than to reach the land, if necessary, to satisfy any unmet liability. Thus, the creditors could have looked to Patty for payment. Patty's remedy against Richard, based upon Richard's voluntary choice to indemnify Patty against that liability, may indeed wipe out any claim by Richard against Patty, but it does not make worthless the obligation which is the focus of the § 166(f) inquiry.[10]
 
 
 35
 Section 166(f) does not permit Richard to recoup via favorable tax status any extra losses he incurred as a result of a collateral agreement he made with Patty after the bonds and guaranty were signed. As the Commissioner points out, even indemnitors, who never had a right to reimbursement or subrogation against the principal debtors, must show the worthlessness of the original obligation in order to benefit from § 166(f). We know of no statutory reason why Richard deserves more preferential treatment.
 
 
 36
 Because the Tax Court erred in ignoring Patty's status as a principal on the performance bonds, we reverse the decision permitting § 166(f) deductibility of Richard's payments as guarantor. We remand to give Richard an opportunity to show, if he can, that Patty's obligation was worthless at the time of the payments. Otherwise, Richard is entitled only to a short term capital loss under § 166(d).
 
 
 37
 The judgment for the government appealed by the taxpayers is affirmed. The judgment for the taxpayers challenged by the government on cross-appeal is reversed and remanded.
 
 
 
 [1]
 Virginia is a party only because she signed the joint tax returns. We will henceforth refer solely to Richard as the taxpayer
 
 
 [2]
 Even if the court were willing to assume a genuine loan making business, the government argues convincingly that the particular loans at issue here would not have been proximately related to that business. Unlike Richard's other lending activity, the loans to his father and SVH were not connected with financing purchases from Richard, nor did Richard insist upon security for credit he extended his father. See United States v. Henderson, 375 F.2d 36, 42 (5th Cir.), cert. denied, 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967)
 
 
 [3]
 Richard does not maintain that the loans made after he took over the reins of SVH (following his father's stroke) deserve separate status in the event this court upholds the Tax Court on the lack of proximate connection with his real estate businesses. In particular, he does not argue that by virtue of his assuming an active role in the affairs of the corporation, he entered the business of managing SVH so that subsequent debts were created or the losses of earlier loans were subsequently sustained in connection with that business. Nor could he
 The Supreme Court held in Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), that furnishing regular services to a corporation, without more, is not a trade or business. As in the instant case, the taxpayer in Whipple received no salary for his services. See also United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972) (a relatively small salary from the corporation was insufficient to insulate the taxpayer's indemnification losses as business bad debts, claimed to have been made to protect the taxpayer's status as an employee of the corporation).
 However, unlike Generes and Whipple, the taxpayer here was not a stockholder of the corporation. Thus, the investment motives generally shared by major shareholders, and found to be dominant in those two cases, could not be attributed to Richard. But this distinction amounts to little difference. Although the average case typically involves sorting out the competing motives of an investor and those of an employee, supplier or buyer (of professional services or goods) (see, e. g., Lundgren v. Commissioner, 376 F.2d 623 (9th Cir. 1967); Hogue v. Commissioner, 459 F.2d 932 (10th Cir. 1972); Dorminey v. Commissioner, 26 T.C. 940 (1956)), other motives might well be involved in any given case, such as personal desire to aid friend or family through tough times (see, e. g., Levin v. United States, 597 F.2d 760, 767 (Ct.Cl.1979). Here, for instance, the Tax Court found that Richard's purpose in becoming actively involved in SVH was to protect his father's very substantial investments and his own (not as a shareholder but as a creditor and perhaps also as a future joint venturer), not to enter the trade or business of managing corporations, or of becoming an employee of SVH, or of insuring development projects for his own businesses.
 
 
 [4]
 The parties agree that the proper characterization of a worthless debt as "business" or "nonbusiness" is a question of fact to be established by the individual circumstances of each case. United States v. Generes, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972); O'Neill v. Commissioner, 271 F.2d 44, 49 (9th Cir. 1959). However, this circuit has also said that whether § 166 of the Code was applied correctly in a given fact situation, involving as it does some measure of statutory interpretation, presents "a mixed question of law and fact." Anderson v. United States, 555 F.2d 236, 237 (9th Cir. 1977). The use of the "shorthand" formulation of the standard of review as a "mixed question," or the dissection of fact and law as separate questions would have no practical effect on the outcome of this case. Richard had the burden of establishing a proximate relationship between the debts or losses and his trade or business. Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); 26 C.F.R. § 1.166-5. The Tax Court correctly found no such connection
 
 
 [5]
 Following the Supreme Court's direction in United States v. Generes, 405 U.S. at 103, 92 S.Ct. at 833, in order to show that the loan or loss was proximately related to his trade or business, Richard must establish that the dominant, not merely a significant, motivation in making the loans was to benefit his trade or business, which we have already determined to be real estate and land development
 
 
 [6]
 Cf. Lundgren v. Commissioner, 376 F.2d 623, 629 (9th Cir. 1967) (anticipated benefit to taxpayer's business from loans to corporation was "real and direct.")
 
 
 [7]
 In 1976, Congress repealed subsection (f) of section 166
 
 
 [8]
 26 U.S.C. § 166(f) reads as follows:
 "A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) (nonbusiness debts) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such a guaranty, endorsement, or indemnity) at the time of such payment."
 
 
 [9]
 In his opening statement in Tax Court, counsel for the Internal Revenue Service identified the "issue" with respect to Richard's payments as guarantor of the performance bonds as "the worthlessness of the debt." The Tax Court's opinion likewise confirms that worthlessness was the "only contention." Nowhere does the record below reveal any question as to how the proceeds of the loan were used
 
 
 [10]
 This is not a situation, like that in Andrew v. Commissioner, 54 T.C. 239 (1970), which calls for piercing form for substance. Taxpayers there were allowed § 166(f) deductibility upon showing that the creditors' claims against the principal debtors were worthless, even though the surety, whom the taxpayers had agreed to indemnify, had not first been called upon to pay the creditors. The Tax Court properly refused to require the taxpayers to act out a potentially more expensive "charade" as a condition of the deduction. As the court stated:
 "By paying the customers directly, (taxpayers) merely telescoped the transaction, and thereby avoided additional expenditures * * * that would have arisen had the surety first been called upon to liquidate the customers' claims." Id. at 247.
 Richard here is not attempting to "telescope" anything. Rather, he wants to avoid a stringent requirement of the statute and in effect nullify the real distinction between a surety and a principal debtor.